# EXHIBIT "A"

1

STATE OF NEW YORK )
                            ) SS.:
COUNTY OF SUFFOLK )

      ELIZABETH COSGROVE, being duly sworn deposes and says:

1.     I was employed as a clerk in the Police Department County of Suffolk, New York from March 2006 through my wrongful termination on November 20, 2009.

2.     Effective March 17, 2008 I was promoted to Senior Clerk Typist.

3.     My duties involved:

(20%) Update the status of warrants into NXView. Warrants must be deleted to avoid arrest of defendants that have appearances for scheduled court date. New warrants must be entered in accordance with court docket.
(10%) File NCIS Fingerprint Response sheets according to arrest date and police precinct for future use.
(40%) Enter past due parking tickets. Tickets must be checked for correct VTL violation charge/fine and amended as necessary. Name of owner/operator is obtained from use of DMV record system and then entered into Unified Court System, labels to tag each ticket are produced. For each ticket entered, the appropriate letter is mailed to defendant stating charge along with a photocopy of the ticket. A court calendar is run for future use.
(15%) Update pleas to tickets (not guilty, abated, motion) which have been accepted at First District Court and correct court docket as necessary.
(15%) Enter cash receipts that have been mailed or paid at Cashier's window.

4.     At all times during my employment with the Police Department, I satisfactorily performed the duties assigned to me.

5.     Since at least April 2008, the Police Department of Suffolk County has engaged in unlawful employment practices, in violation of Section 703(a) of Title VII, 42 U.S.C. §2000e-2(c)(2), by creating a sexually hostile work environment based on my sex as well as other similarly situated female employees.

6. Upon Lt. Petrowski's retirement in April 2008, Lt. Hasper became commanding officer of the Court Liaison Office of the Suffolk County Police Department and supervisor over me.

7. The congenial atmosphere of the Liaison Office changed with the arrival of Lt. Hasper.

8. Rather than working to see that office staff worked in a cooperative manner, Lt. Hasper appeared to enjoy setting up office staff against one another.

9. For example, on one occasion, Lt. Hasper suggested to me that I tell another employee, Betty Bunton, whom I was assisting, that I was returning to my desk "just to piss her off."

10. Once Lt. Hasper was Court Liaison Commanding officer, me and other employees who worked in the back of the Court Liaison Office stopped coming to the front for breaks because we did not want to deal with the antics of Lt. Hasper.

11. Lt. Hasper did not keep regular hours, and he told the employees in the Court Liaison Office that he was "untouchable" because of his "political connections."

12. Lt. Hasper did not respect boundaries and treated female employees as potential sexual conquests rather than as employees of the County working on a common mission.

13. When I was promoted to Senior Clerk Typist, Lt. Hasper told court employees that he was responsible for my upgrade, even though the arrival came about as a result of a desk audit conducted under the previous Lt., Jack Petrowski.

14. When my promotion became effective, Lt. Hasper repeatedly pressured me to go to lunch with him to celebrate my promotion.

15. I repeatedly turned down Lt. Hasper's invitations because I needed to go home to lunch with my son, but I agreed when he told me that he was inviting all the women in the office.

16. Just before the group lunch was supposed to occur, another employee, Joan Monteserrato, told me that Lt. Hasper had made it clear to the other women that he only wanted to go to lunch with me.

17. Although I wanted to drive my own car to lunch at the Peter Pan diner, Lt. Hasper insisted that we go together in an unmarked Police Department vehicle.

18. Instead of returning to the office following lunch, Lt. Hasper drove me to the Brightwaters area, where he pulled into the driveway of a home, which he identified as the home of a politician who was a friend of his.

19. Lt. Hasper knocked on the front door of the home, and when he got no answer he returned to the car and said, "Someday this will be all yours. Liz, if you treat me right, I'll do the right thing by you."

20. Lt. Hasper's statement frightened me because I interpreted his remarks to be a request that I perform a sexual act on him.

21. About one month following the lunch incident, I requested a tour change from Lt. Hasper.

22. I told Lt. Hasper that I needed the tour change in order to continue working a second job with the Transportation Safety Administration ("TSA") dictated by financial necessity, which I detailed for him.

23. I explained that my reasons for requesting the tour change were personal and requested that Lt. Hasper not discuss my request with anyone else in the office.

24. About one month later, Lt. Hasper had not made a decision on my request for a tour change, but I learned that he had discussed my request with at least one other employee, Joan Monteserrato.

25. When I confronted Lt. Hasper about betraying my confidentiality, he reacted angrily, ordering me to discuss the matter with Joan in his office, then, when I began to follow him to his office, turning and grabbing my arm above the elbow and stating in a nasty tone of voice, "What do you think this is going to prove?"

26. P.O. Schneider, who apparently also had learned of my request for a tour change, stated in front of other employees, "You ain't getting your hours; just give him a blow job and you'll get whatever you want."

27. In February 2009, I proposed that I be given the responsibility of entering state warrants into the system, since the state employee who performed that function left at noon each day and state supervisors requested that police personnel enter the warrants, but Lt. Hasper turned down my request.

28. One of the state supervisors, Vinny Calcaterra, reported to me that Lt. Hasper became agitated and unprofessional when he told Mr. Calcaterra that he did not want me performing that function.

29. In July 2009, I again asked for a change of tour.

30. Lt. Hasper responded in an inappropriate manner, telling me I should get more money from my former husband, questioning how I had paid my bills the year before, and asking to speak to my TSA supervisor to see if I was lying about flight changes at the airport.

31.     Lt. Hasper never granted my tour change, and I was required to use Annual Leave in order to leave 30 minutes early one day per week for my second job with the TSA, even though Lt. Hasper allowed other employees in the office to attend doctor's appointments, get car repairs, or run other errands without using leave.

32.     I also had to report that I was leaving for lunch, even though other employees were not required to do so.

33.     In September 2010, Lt. Hasper questioned me about some lengthy telephone calls to the New York City Police Academy and asked whether I knew anyone at the Academy.

34.     Lt. Hasper appeared peeved when he learned that my friend at the Academy was male.

35.     Lt. Hasper called me a liar in response to my answers concerning the phone calls, then told me I needed a good spanking and I just got spanked.

36. A day or two later I was transferred to the Central Records office.

37. Following my transfer to Central Records, Lt. Hasper apparently overheard a conversation between two Court Liaison Office employees about seeing me and my friend from the Academy at Carvel and started questioning the two women about my friend.

38. Sometime thereafter, Lt. Hasper telephoned the New York City Police Department Office of Internal Affairs and suggested that office investigate my friend and take action against him.

39. Lt. Hasper then asked a member of the New York City Police Department Internal Affairs to show the two employees a photo spread with my friend's picture included and asked them to identify my friend.

40. Thereafter Lt. Hasper took a representative from the New York City Police Department Internal Affairs into a court café and asked the manager, Pam Kaleita, to give a statement about seeing me with my friend in the café.

41. Because of Lt. Hasper's ongoing harassment of me, I was forced to resign my employment with Suffolk County on November 20, 2009.

42. On December 10, 2009, after I had left my job, Lt. Hasper again visited the café and asked Ms. Kaleita for any "dirt" she had on "Liz and her friend."

43. When Ms. Kaleita refused to cooperate, Lt. Hasper stormed out of the café , leaving Ms. Kaleita in fear.

44.     Lt. Hasper also made public sexual remarks about other employees in the Court Liaison Office.  For example, during a meeting with union representatives Jeanie and Ben, Lt. Hasper stated that P.O. Salerno, a female officer assigned to the Court Liaison Office, performed sexual acts with her dogs.

45.     Other Court Liaison Office employees told me that Lt. Hasper had made sexual remarks and/or advances to café employees and assistant district attorneys.

46.     On December 21, 2009, I filed a written Sexual Harassment Complaint with the Suffolk County Police Department.

47.     On May 12, 2010, I complained to the EEOC about the discriminatory actions of the Suffolk County Police Department.

48.     The Police Department constructively discharged me by creating such an intolerably hostile work environment that I was forced to leave my employment with the Police Department.

49.     The effect of the practices of the Police Department has been to deprive me and other similarly situated women of equal employment opportunities and otherwise adversely affect their status as employees.

50.     The unlawful employment practices were intentional.

51.     The unlawful employment practices were done with malice or with reckless indifference to the federally protected rights of me and other similarly situated women.

52.     I am providing this affidavit to the EEOC as part of my "Charge of

Discrimination" and understand that this affidavit will be utilized by the EEOC to make findings regarding potential charges and/or a Notice of Right to Sue.

                                                  /S/
                                  ELIZABETH COSGROVE

Sworn to this ____
Day of November, 2010