UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ELIZABETH COSGROVE and LAURIE SALERNO, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 11-CV-3112 (JFB)(ETB) |
| COUNTY OF SUFFOLK, SUFFOLK COUNTY POLICE DEPARTMENT, and LT. WILLIAM F. HASPER, | ) ) ) ) ) | |
| Defendants. | ) | |

SECOND AMENDED COMPLAINT

In support of their Second Amended Complaint for damages for hostile environment sexual harassment in violation of Title VII of the Civil Rights Act of 1964, as amended, the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, as enforced by 42 U.S.C. § 1983, and the New York Human Rights Law, Plaintiffs Elizabeth Cosgrove and Laurie Salerno ("Plaintiffs"), by and through their attorneys, O'Brien & O'Brien, LLP, state as follows:

## JURISDICTION AND VENUE

1:      Plaintiffs bring this action for damages and equitable relief pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., *as amended*, 42 U.S.C. § 1981a, 42 U.S.C. 1983, and Executive Law § 296(6).

2.      Jurisdiction of this action is conferred upon the Court by 28 U.S.C. §§ 1331, 1367, and 1343(a)(3), and 42 U.S.C. § 2000e-5(f)(3).

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendants reside in the Eastern District of New York and a substantial part of the unlawful employment practices alleged occurred in that district.

## PARTIES

4.      Plaintiff Elizabeth Cosgrove is an adult female person and a resident of the State of New York, Suffolk County.

5.      Plaintiff Laurie Salerno is an adult female person and a resident of the State of New York, Suffolk County, and an employee of Suffolk County.

6.      Defendant County of Suffolk ("County") is a political subdivision of the State of New York and an employer within the meaning of 42 U.S.C. § 2000e(b) and Executive Law § 292(4).

7.      Defendant Lt. William F. Hasper ("Lt. Hasper") is an adult male person and resident of the State of New York, Suffolk County, an employee of Suffolk County, and a person within the meaning of Executive Law § 292(1).  He is sued in his individual capacity.

**JURY DEMAND**

8.      Plaintiffs demand a trial by jury on each and every claim to which they are so entitled.

**STATEMENT OF FACTS**

9.      Plaintiff Cosgrove was employed by the Suffolk County Police Department as a Clerk from March 2006 through her wrongful termination on November 20, 2009.

10.     Plaintiff Salerno has been employed by the Suffolk County Police Department as a police officer since 1988.

11.     Lt. Hasper has been employed by the Suffolk County Police Department as a police officer since about 1993.

12.     Lt. Hasper was the Commanding Officer of the Court Liaison Office, and was Plaintiffs' supervisor, from about August 2007 through about March 2010.

13.     On information and belief, Lt. Hasper has a history of being transferred from one division of the Suffolk County Police Department to another because of his sexual harassment of women.

## Allegations Specific To Plaintiff Cosgrove

14.    At all times during her employment with Defendant, Plaintiff Cosgrove satisfactorily performed the duties assigned to her.

15.    From the time of her transfer to court liaison until his retirement in July 2007, Plaintiff Cosgrove was supervised by Lt. Jack Petrowski of the Suffolk County Police Department.

16.    Upon Lt. Petrowski's retirement in July 2007, Defendant Lt. Hasper became Commanding Officer of the Court Liaison Office of the Suffolk County Police Department and Plaintiff Cosgrove's supervisor.

17.    The congenial atmosphere of the Court Liaison Office changed with the arrival of Lt. Hasper.

18.    Rather than working to see that office staff worked in a cooperative manner, Lt. Hasper appeared to enjoy setting up office staff against one another.

19.    For example, on one occasion, Lt. Hasper suggested to Plaintiff Cosgrove that she tell another employee, Betty Bunton, whom Cosgrove was assisting, that Cosgrove was returning to her desk "just to piss her off."

20.    Once Lt. Hasper was Court Liaison Command Officer, Plaintiff Cosgrove and other employees who worked in the back of the Court Liaison Office stopped coming to the front for their breaks because they did not want to deal with the antics of Lt. Hasper.

21.    Lt. Hasper did not keep regular hours, and he told the employees including plaintiffs in the Court Liaison Office that he was "untouchable" because of his "political connections."

22.    Lt. Hasper did not respect boundaries and treated female employees as potential sexual conquests rather than as employees of the County working on a common mission.

23.    Effective March 17, 2008, Plaintiff Cosgrove was promoted to Senior Clerk Typist.

24.    Plaintiff's duties as Senior Clerk Typist involved

(20%) Update the status of warrants into NXView. Warrants must be deleted to avoid arrest of defendants that have appearances for scheduled court date. New warrants must be entered in accordance with court docket.

(10%) File NCIS Fingerprint Response sheets according to arrest date and police precinct for future use.

(40%) Enter past due parking tickets. Tickets must be checked for correct VTL violation charge/fine and amended as necessary. Name of owner/operator is obtained from use of DMV record system and then entered into Unified Court System, labels to tag each ticket are produced. For each ticket entered, the appropriate letter is mailed to defendant stating charge along with a photocopy of the ticket. A court calendar is run for future use.

(15%) Update pleas to tickets (not guilty, abated, motion) which have been accepted at First District Court and correct court docket as necessary.

(15%) Enter cash receipts that have been mailed or paid at Cashier's window.

25.    When Plaintiff Cosgrove was promoted to Senior Clerk Typist, Lt. Hasper told court employees that he was responsible for her upgrade, even though the arrival came about as a result of a desk audit conducted under Lt. Petrowski.

26.    When Plaintiff Cosgrove's promotion became effective, Lt. Hasper repeatedly pressured her to go to lunch with him to celebrate her promotion.

5

27.    Plaintiff Cosgrove repeatedly turned down Lt. Hasper's invitations because she needed to go home to lunch with her son, but she agreed when he told her that he was inviting all the women in the office.

28.    Just before the group lunch was supposed to occur, another employee, Joan Monteserrato, told Plaintiff Cosgrove that Lt. Hasper had made it clear to the other women that he only wanted to go to lunch with Plaintiff Cosgrove.

29.    Although Plaintiff Cosgrove wanted to drive her own car to lunch at the Peter Pan diner, Lt. Hasper insisted that they go together in an unmarked Police Department vehicle.

30.    Instead of returning to the office following the time allocated to Plaintiff Cosgrove for her unpaid lunch period, Lt. Hasper drove Plaintiff Cosgrove to the Brightwaters area, where he pulled into the driveway of a private house, which he identified as the home of a politician who was a friend of his.

31.    Lt. Hasper knocked on the front door of the home, and when he got no answer he returned to the car and said, "Someday this will be all yours.  Liz, if you treat me right, I'll do the right thing by you."

32.    Lt. Hasper's statement frightened Plaintiff Cosgrove because, in light of all the circumstances surrounding the lunch and her observation of his treatment toward women since he became Commanding Officer of the Court Liaison Office, she interpreted his remarks to be a request that she perform a sexual act on him.

33.    About one month following the lunch incident, Plaintiff Cosgrove requested a tour change from Lt. Hasper.

34.    Plaintiff Cosgrove told Lt. Hasper that she needed the tour change in order to continue working a second job with the Transportation Safety Administration ("TSA") dictated by financial necessity, which she detailed for him.

35.    Plaintiff Cosgrove explained that her reasons for requesting the tour change were personal and requested that Lt. Hasper not discuss her request with anyone else in the office.

36.    About one month later, Lt. Hasper had not made a decision on her request for a tour change, but Plaintiff Cosgrove learned that he had discussed her request with at least one other employee, Joan Monteserrato.

37.    When Plaintiff Cosgrove confronted Lt. Hasper about betraying her confidentiality, he reacted angrily, ordering her to discuss the matter with Joan in his office, then, when she began to follow him to his office, turning and grabbing her arm above the elbow and stating in a nasty tone of voice, "What do you think this is going to prove?"

38.    P.O. Schneider, who apparently also had learned of Plaintiff's request for a tour change, stated in front of other employees, "You ain't getting your hours; just give him a blow job and you'll get whatever you want."

39.    In February 2009, Plaintiff Cosgrove proposed that she be given the responsibility of entering state warrants into the system, since the state employee who performed that function left at noon each day and state supervisors requested that police personnel enter the warrants, but Lt. Hasper turned down her request.

40.    One of the state supervisors, Vinny Calcaterra, reported to Plaintiff Cosgrove that Lt. Hasper became agitated and unprofessional when he told Mr. Calcaterra that he did not want Plaintiff performing that function.

41.    In July 2009, Plaintiff Cosgrove again asked for a change of tour.

42.    Lt. Hasper responded in an inappropriate manner, telling Plaintiff Cosgrove she should get more money from her former husband, questioning how she had paid her bills the year before, and asking to speak to her TSA supervisor to see if Plaintiff was lying about flight changes at the airport.

43.    Lt. Hasper never granted Plaintiff's tour change, and she was required to use annual leave in order to leave 30 minutes early one day per week for her second job with the TSA, even though Lt. Hasper allowed other employees in the office to attend doctor's appointments, get car repairs, or run other errands without using leave.

44.    Plaintiff Cosgrove also had to report that she was leaving for lunch, even though other employees were not required to do so.

45.    On August 27, 2009, Lt. Hasper issued a written reprimand to Plaintiff Cosgrove, alleging that she was not at her assigned duty station at 1430 hours and that she falsely claimed she was taking personal time during her absence from her duty station.

46.    On September 2, 2009, Lt. Hasper issued a verbal reprimand to Plaintiff Cosgrove, alleging that she signed out of the Court Liaison Office at 1535 hours against his direct order to sign out no earlier than 1555 hours.

47.     On September 2, 2009, Lt. Hasper established special rules just for Plaintiff Cosgrove.  She had to call when she was going to lunch and she had to go downstairs to sign out at the end of the day.

48.     In September 2009, Lt. Hasper questioned Plaintiff Cosgrove about some lengthy telephone calls to the New York City Police Academy and asked whether she knew anyone at the Academy.

49.     Lt. Hasper appeared peeved when he learned that Plaintiff's friend at the Academy was male.

50.     Lt. Hasper called Plaintiff Cosgrove a liar in response to her answers concerning the telephone calls, then told her that she needed a good spanking and that she just got spanked.

51.     On or about October 14, 2009, Lt. Hasper telephoned the New York City Police Department Office of Internal Affairs and suggested that that office investigate Plaintiff's friend and take action against him.

52.     On or about October 19, 2009, Plaintiff Cosgrove was transferred to the Central Records office.

53.     On Plaintiff Cosgrove's first day of work in Central Records, Lt. Hasper telephoned her new boss and made disparaging remarks about her.

54.     Following Plaintiff's transfer to Central Records, Lt. Hasper apparently overheard a conversation between two Court Liaison Office employees about seeing Plaintiff Cosgrove and her friend from the Academy at Carvel and started questioning the two women about Plaintiff's friend.

55.     On October 21, 2009, Lt. Hasper stated in front of Monica Gruenheid and others that he wanted Plaintiff Cosgrove fired based on whom she was dating.

56.     On October 28, 2009, Lt. Hasper asked a member of New York City Police Department Internal Affairs to show Monica Gruenheid and Betty Bunton a photo spread and asked them to identify Plaintiff Cosgrove's friend, but neither employee recognized Plaintiff Cosgrove's friend or knew his name.

57.     Thereafter, Lt. Hasper took a representative from the New York City Police Department Internal Affairs into a court café and asked the manager, Pam Kaleita, to give a statement about seeing Plaintiff Cosgrove with her friend in the café.

58.     Because of Lt. Hasper's ongoing harassment of Plaintiff Cosgrove, she was forced to resign her employment with Suffolk County, effective November 21, 2009.

59.     In her Resignation of Member letter, dated November 20, 2009, Plaintiff Cosgrove stated that she was forced to resign her position because of Lt. Hasper's ongoing harassment of her and his interference with her personal life, which was causing stress in her home life and in the work place.  A copy of Plaintiff Cosgrove's Resignation of Member letter is attached as Exhibit "**A**."

60.     At her exit interview with a representative of the County, Plaintiff Cosgrove was asked whether she intended to file a notice of claim.

61.     On December 8, 2009, Plaintiff Cosgrove signed an Employee Rights Form, provided by the County, which acknowledged that she had the right to bring a claim for, inter alia, sexual harassment.  A copy of the Employee Rights Form is attached as Exhibit "**B**."

62.     On December 10, 2009, after Plaintiff Cosgrove had left her job, Lt. Hasper again visited the café and asked Ms. Kaleita for any "dirt" she had on "Liz and her friend."

63.     When Ms. Kaleita refused to cooperate, Lt. Hasper stormed out of the café, leaving Ms. Kaleita in fear.

64.     Lt. Hasper also made public sexual remarks about other employees in the Court Liaison Office. For example, during a meeting with union representatives Jeanie and Ben, Lt. Hasper stated that Plaintiff Salerno, a female officer assigned to the Court Liaison Office, performed sexual acts with her dogs.

65.     Other Court Liaison Office employees told Plaintiff that Lt. Hasper had made sexual remarks and/or advances to café employees and assistant district attorneys.

66.     On December 21, 2009, Plaintiff Cosgrove filed a written Sexual Harassment Complaint with Suffolk County.  A copy of the Sexual Harassment Complaint Form is attached as Exhibit "**C**."

67.     Plaintiff Cosgrove was prompted to file the Sexual Harassment Complaint Form by the inquiry regarding her intent to file a notice of claim at her exit interview and she intended that the Sexual Harassment Complaint Form would serve as a notice of claim of her sexual harassment complaint.  Plaintiff Cosgrove was not represented by counsel at the time she filed the Sexual Harassment Complaint Form.

68.     Prior to filing the written complaint, Plaintiff Cosgrove complained about Lt. Hasper's behavior to civilian union representative Ben, Sgt. Nancy Burn, Chief Robert Moore, and Captain Nieves.

69.     In response to Plaintiff Cosgrove's filing of the Sexual Harassment Complaint Form, the Internal Affairs Bureau ("IAB") of the County Police Department put Lt. Hasper under surveillance for three weeks in February 2010.

70.     The IAB determined from its surveillance of Lt. Hasper that he was driving a County-owned vehicle to visit illegal massage parlors in another county at times he was supposed to be working.

71.     As part of the investigation arising out of Plaintiff Cosgrove's filing of the Sexual Harassment Complaint Form, on March 3, 2010, Plaintiff Cosgrove submitted a 10-page narrative of her complaint against Lt. Hasper to Lt. Holvik of the IAB.  A copy of the narrative statement and a cover page is attached as Exhibit "**D**."

72.     On March 10, 2010, Lt. Hasper was transferred to the office of the Chief of Department, where he had no subordinates.

73.     On April 10, 2010, Police Commissioner Richard Dormer sent Plaintiff Cosgrove a letter offering to reinstate her to her prior position as Senior Clerk Typist as a result of staffing changes, including assignment of a new Commanding Officer.  A copy of the April 10, 2010 letter is attached as Exhibit "**E**."

74.     On April 19, 2010, Betty A. Bunton, Joan Monteserrato, Monica Gruenheid, and Sandra Lezinsky submitted a written request for an interview to report sexual harassment by Lt. Hasper to Lt. James Strack, Commanding Officer of the Court Liaison Office.

75.     On April 19, 2010, Lt. Hasper was reassigned to the 4th Precinct.

76.     On April 20, 2010, Lt. Hasper was reassigned to the 3rd Precinct because the County learned that Plaintiff Cosgrove and Plaintiff Salerno lived in the 4th Precinct.

## Allegations Specific To Plaintiff Salerno

77.     At all times during her employment with Defendant, Plaintiff Salerno satisfactorily performed the duties assigned to her.

78.     Plaintiff Salerno was assigned to the Court Liaison Office in 2000, and she has continued that assignment through the present.

79.     On May 2, 2008, Plaintiff Salerno filed a written Sexual Harassment Complaint with Suffolk County.  A copy of the Discrimination Complaint Form is attached as Exhibit "**F**."

80.     Plaintiff Salerno complained that Lt. Hasper, who began supervising her in August 2007, should not supervise the office because seven or eight years earlier he had followed her from the courtroom where she was testifying and requested a date, and then, after she turned him down because she was seeing someone else, he had obtained her personal telephone number from office records and called her to pressure her for a date.

81.     Plaintiff Salerno complained that Lt. Hasper intimidated the civilian workers by cornering them if they spoke with her.

82.     Plaintiff Salerno complained that Lt. Hasper should not supervise the office because three female employees in the First Precinct and two female employees in the Second Precinct had complained of harassment by Lt. Hasper.

83.     Plaintiff Salerno complained that Lt. Hasper should not supervise the office because he had been banned from the District Attorney's Office for going into the office and asking female assistant district attorneys if they needed rides to their cars, even though their cars were only 100 feet away.

84.    Plaintiff Salerno complained that on March 22, 2008, Lt. Hasper used her computer without her permission and accessed a pornography site which caused such severe problems to her computer that she had to get a replacement.

85.    Plaintiff Salerno complained that on May 2, 2008, Lt. Hasper stated to her in the presence of three other officers that she was not to wear her police sweater, even though she had a doctor's note which had permitted her to wear the sweater for the previous eight years.  He told her to find the note, but it was missing from her file.

86.    The next day, May 3, 2008, Plaintiff Salerno gave Lt. Hasper a new doctor's note authorizing her to wear a police sweater, but Lt. Hasper said he had talked to the chiefs about her, indicating her note was not sufficient.

87.    After Plaintiff Salerno filed her complaint, Lt. Hasper continued to demean her work.

88.    Lt. Hasper's mistreatment of Plaintiff Salerno after she filed the Sexual Harassment Complaint caused Bill Schneider to state on July 16, 2008 that he wanted to start a pool as to when Lt. Hasper would throw Plaintiff Salerno out of the office.

89.    At inspection on August 4, 2008, and other dates, Lt. Hasper gave new information from Department Directives to male officers, but did not give such information to Plaintiff Salerno.

90.    On August 11, 2008, Plaintiff Salerno learned that after Lt. Hasper was questioned about accessing pornography sites on her computer, he directed other officers to pick schedules that would make it difficult for Plaintiff Salerno to schedule her wedding.

91.     During a meeting about criminal summonses with other officers in the Court Liaison Office on August 25, 2008, Lt. Hasper placed his chair directly in front of Plaintiff Salerno, sat with his back towards her and ignored her when she asked questions, while answering questions posed by male officers.

92.     Lt. Hasper frequently would not approve Plaintiff Salerno's requests for days off, while granting requests for days off from male employees.  For example, on October 31, 2008, he forced her to make a choice between taking a personal leave day for Halloween and working on the street, but he did not require male officers to make that choice.

93.     Lt. Hasper charged time against Plaintiff Salerno if she had to come in late due to a doctor's appointment, but he did not charge time against male employees who came in late due to a doctor's appointment.

94.     On September 22, 2008, Lt. Hasper stood by Plaintiff Salerno's desk and falsely stated to another officer that Plaintiff Salerno attended the last PBA meeting dressed in a low-cut top and tight jeans without a jacket or sweater.

95.     When Lt. Hasper was outside the Court Liaison Office and called in, he would hang up if Plaintiff Salerno answered the telephone, but not if a male answered the telephone.

96.     On November 4, 2008, Lt. Hasper told Mike Schneider to "screw" Plaintiff out of overtime for November 5, 2008 then he falsely told Sgt. Feeney that Plaintiff Salerno had charged him with sexual harassment and had called someone an ethnic slur.

97.     On November 7, 2008, Lt. Hasper left Plaintiff Salerno to perform three jobs, although he generally brought in one or two other officers when male officers were faced with too many jobs.

98.     On November 21, 2008, Lt. Hasper stated to other Commanding Officers in the presence of Monica Gruenheid, referring to Plaintiff Salerno, "I tried to get rid of that psycho bitch, but nobody wants her.  I told them I didn't want her here."

99.     On November 23 and November 24, 2008, after Plaintiff Salerno's internal sexual harassment charges were determined to be unfounded, Lt. Hasper stated to the entire Court Liaison Office that he was untouchable and he was not going anywhere.

100.    On November 25, 2008, Lt. Hasper stated to P.O. Ingrid Schwen that she should come to work in the Court Liaison Office because there will be an opening soon, and the office needed to replace its female.

101.    On November 25, 2008, Lt. Hasper stood beside Plaintiff Salerno as she was using the printer and stated that he sure would hate to be on patrol and he was not going back to patrol, "like you."

102.    On January 26, February 17, and November 13, 2009, Lt. Hasper unnecessarily remarked to other male officers that "if he touches you inappropriately, that's sexual harassment," and then stared at Plaintiff Salerno, who was also present, and laughed.

103.    On October 16, 2009, Lt. Hasper initially asked Plaintiff Salerno not to take a lunch break because the office was busy and then allowed her a 30-minute lunch break, but he allowed all of the male officers to take a full lunch break.

104.    On November 9, 2009, Lt. Hasper told an assistant attorney general not to come to the Court Liaison Office to work on arrests on a particular day because "I have the female cop.  Come in tomorrow when the A Team is working and the guys will be here."

105.   On December 8, 2009, he offered to allow Mike Flood to attend a union meeting on work time, even though he required Plaintiff Salerno to take personal time to attend morning union meetings, then looked at her and laughed.

106.   On December 8, 2009, Plaintiff Salerno submitted a written request to work at TVB to Lt. Hasper, but he threw it away, stating, "yeah, that's not happening," even though Mike Flood pointed out that Lt. Hasper hated Plaintiff Salerno and she would be working in another building.

107.   On January 26, 2010, Lt. Hasper stated to another officer in Plaintiff Salerno's presence, "hey, you covered your book; hey, its not porn, if it was, that's really bad, you know" and then looked at Plaintiff Salerno and laughed.

108.   On January 26, 2010, Plaintiff Salerno learned from Betty Bunton that Lt. Hasper kept a secret file on Plaintiff Salerno, including pictures of her dogs stapled to pieces of paper he ripped off the TVB bulletin board.

109.   On February 26, 2010, when there was a heavy snow and Plaintiff Salerno and several male officers made the effort to arrive at the office on time, Lt. Hasper ordered Plaintiff Salerno to return home and take a half day's leave, but allowed the male officers to remain in the office and work, in spite of Plaintiff Salerno's expressed need to perform her duties.  Lt. Hasper responded that if she did not like it, she would need her sweater because she would be walking a foot post in the 7th Precinct.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

110.    On or about May 12, 2010, Plaintiff Cosgrove timely filed a Charge of Discrimination against Defendant Suffolk County with the Equal Employment Opportunity Commission ("EEOC").   A copy of the Charge of Discrimination is attached as Exhibit "**G**."

111.    Plaintiff Cosgrove's EEOC Charge of Discrimination mentioned sexual harassment of other employees, including Plaintiff Salerno.

112.    The County was notified of the Charge on May 18, 2010. A copy of the notification is attached as Exhibit "**H**."

113.    On November 17, 2010 Plaintiff Cosgrove filed a supplemental affidavit with the EEOC.  A copy of the affidavit is attached as Exhibit "**I**.".

114.    On or about April 11, 2011, the EEOC issued Plaintiff a Right to Sue letter. A copy of the Right to Sue letter is attached as Exhibit "**J**."

115.    Under the "single filing rule," Plaintiff Salerno is entitled to join this Title VII lawsuit without filing a charge with the EEOC because her claims arose out of the same circumstances and occurred within the same general time frame as the claims of Plaintiff Cosgrove.

## AS AND FOR A FIRST CAUSE OF ACTION

### (Both Plaintiffs' Claim of Title VII Hostile Environment
### Sex Discrimination Against Suffolk County)

116.    The allegations set forth in 1 through 115 are incorporated by reference as if fully set forth herein.

117.   During and after the time he supervised the Plaintiffs, Lt. Hasper subjected each of them to unwanted sexual harassment on account of her gender.

118.   The daily harassment was sufficiently severe or pervasive as to alter the conditions of Plaintiffs' employment and create an abusive work environment.

119.   Lt. Hasper's sexually objectionable conduct was offensive such that a reasonable person would find it hostile and/or abusive, and both Plaintiffs did in fact perceive it to be so.

120.   Plaintiff Cosgrove was forced to resign her employment due to the hostile environment in the Court Liaison Office.

121.   Defendant Suffolk County was aware of Lt. Hasper's abusive conduct and failed to take any action.

122.   All of the foregoing actions and inactions were undertaken in violation of 42 U.S.C. § 2000e-2(a).

123.   As a result of the aforementioned unlawful employment actions, Plaintiffs have suffered harm, including loss of earnings and emotional pain, humiliation, mental anguish, loss of enjoyment of life, and emotional distress.

## AS AND FOR A SECOND CAUSE OF ACTION

### (Both Plaintiffs' Claim of State Human Rights Law Hostile Environment Sex Discrimination Against Suffolk County)

124.   The allegations set forth in paragraphs 1 through 123 are incorporated by reference as if fully set forth herein.

125.   Suffolk County's actions and inactions with regard to the hostile environment in the Court Liaison Office were undertaken in violation of the State Human Rights Law, Executive Law § 296(1)(a).

126.   As a result of the aforementioned unlawful employment actions, Plaintiffs have suffered harm, including loss of earnings and emotional pain, humiliation, mental anguish, loss of enjoyment of life, and emotional distress.

## AS AND FOR A THIRD CAUSE OF ACTION

### (Both Plaintiffs' Claim of State Human Rights Law Hostile Environment Sex Discrimination Against Lt. Hasper)

127.   The allegations set forth in paragraphs 1 through 126 are incorporated by reference as if fully set forth herein.

128.   Lt. Hasper actually participated in the conduct giving rise to the hostile environment in the Court Liaison Office, in violation of the State Human Rights Law, Executive Law § 296(6).

129.   As a result of Lt. Hasper's unlawful employment actions, Plaintiffs have suffered harm, including loss of earnings and emotional pain, humiliation, mental anguish, loss of enjoyment of life, and emotional distress.

## AS AND FOR A FOURTH CAUSE OF ACTION

### (Plaintiff Cosgrove's Claim of Title VII Quid Pro Quo Sex Discrimination against Suffolk County)

130.   The allegations set forth in paragraphs 1 through 129 are incorporated by reference as if fully set forth herein.

131.    By his behavior and statements toward Plaintiff Cosgrove, Lt. Hasper conveyed to Plaintiff that the terms and conditions of her employment were dependent upon her submission to his unwelcome sexual requests and mistreatment on account of her gender, in violation of 42 U.S.C. § 2000e-2(a).

132.    When Plaintiff Cosgrove failed to accede to those requests, Lt. Hasper, inter alia, refused to grant her a change of tour, refused to allow her to enter state warrants into the system, had her transferred to Central Records, and forced her to resign her position.

133.    As a result of Lt. Hasper's unlawful employment actions, Plaintiff Cosgrove has suffered harm, including loss of earnings and emotional pain, humiliation, mental anguish, loss of enjoyment of life, and emotional distress.

## AS AND FOR A FIFTH CAUSE OF ACTION

### (Plaintiff Cosgrove's Claim of State Human Rights Law Quid Pro Quo Sex Discrimination Against Suffolk County)

134.    The allegations set forth in paragraphs 1 through 133 are incorporated by reference as if fully set forth herein.

135.    Suffolk County's actions and inactions with regard to the quid pro quo sex discrimination against Plaintiff Cosgrove were undertaken in violation of the State Human Rights Law, Executive Law § 296(1)(a).

136.    As a result of the aforementioned unlawful employment actions, Plaintiff Cosgrove has suffered harm, including loss of earnings and emotional pain, humiliation, mental anguish, loss of enjoyment of life, and emotional distress.

## AS AND FOR A SIXTH CAUSE OF ACTION

### (Plaintiff Cosgrove's Claim of State Human Rights Law
### Quid Pro Quo Sex Discrimination Against Lt. Hasper)

137.    The allegations set forth in paragraphs 1 through 136 are incorporated by reference as if fully set forth herein.

138.    Lt. Hasper actually participated in the conduct giving rise to allegations of quid pro quo sex discrimination, in violation of the State Human Rights Law, Executive Law § 296(6).

139.    As a result of Lt. Hasper's unlawful employment actions, Plaintiff Cosgrove has suffered harm, including loss of earnings and emotional pain, humiliation, mental anguish, loss of enjoyment of life, and emotional distress.

## AS AN FOR A SEVENTH CAUSE OF ACTION
### (Plaintiff Salerno's Title VII Retaliation
### Claim Against Suffolk County)

140.    The allegations set forth in paragraphs 1 through 139 are incorporated by reference as if fully set forth herein.

141.    In filing her written Sexual Harassment Complaint with Suffolk County, Plaintiff engaged in protected activity under Title VII.

142.    Lt. Hasper took adverse employment action against Plaintiff Salerno by, inter alia, creating a sexually hostile environment, requiring her to take unnecessary leave, refusing her reasonable requests to take leave and demeaning her before her colleagues.

143.    In violation of Title VII, 42 U.S.C. § 2000e-3(a), Lt. Hasper took the adverse employment action against Plaintiff Salerno on account of her lawful complaint of sexual harassment and he treated her less favorably than similarly situated male employees.

144.    Defendant Suffolk County either knew about Lt. Hasper's actions or acquiesced in such actions so as to condone and encourage his behavior.

145.    As a proximate cause of the aforementioned unlawful employment actions, Plaintiff Salerno has suffered harm, including loss of earnings and emotional pain, humiliation, mental anguish, loss of enjoyment of life, and emotional distress.

## AS AND FOR AN EIGHTH CAUSE OF ACTION

### (Plaintiff Salerno's Claim of State Human Rights Law Retaliation Against Suffolk County)

146.    The allegations set forth in paragraphs 1 through 145 are incorporated by reference as if fully set forth herein.

147.    Suffolk County's actions and inactions taken in response to Lt. Hasper's retaliatory acts, as set forth in the Seventh Cause of Action, were undertaken in violation of the State Human Rights Law, Executive Law § 296(7).

148.    As a result of the aforementioned unlawful employment actions, Plaintiff Salerno has suffered harm, including loss of earnings and emotional pain, humiliation, mental anguish, loss of enjoyment of life, and emotional distress.

## AS AND FOR A NINTH CAUSE OF ACTION

### (Plaintiff Salerno's Claim of State Human Rights
### Law Retaliation Against Lt. Hasper)

149.   The allegations set forth in paragraphs 1 through 148 are incorporated by reference as if fully set forth herein.

150.   Lt. Hasper actually participated in the conduct giving rise to the unlawful retaliation, in violation of the State Human Rights Law, Executive Law § 296(6), (7).

151.   As a result of Lt. Hasper's unlawful employment actions, Plaintiffs have suffered harm, including loss of earnings and emotional pain, humiliation, mental anguish, loss of enjoyment of life, and emotional distress.


## AS AND FOR A TENTH CAUSE OF ACTION

### (Both Plaintiffs' Claim of a Denial of Equal Protection in
### Violation of 42 U.S.C. § 1983 Against Lt. Hasper)

152.   The allegations set forth in paragraphs 1 through 151 are incorporated by reference as if fully set forth herein.

153.   During and after the time he supervised the Plaintiffs, Lt. Hasper subjected each of them to unwanted sexual harassment on account of her gender in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

154.   The daily harassment was sufficiently severe or pervasive as to alter the conditions of Plaintiffs' employment and create an abusive work environment.

155.    Lt. Hasper's sexually objectionable conduct was offensive such that a reasonable person would find it hostile and/or abusive, and both Plaintiffs did in fact perceive it to be so.

156.    At all times relevant, Lt. Hasper was acting as a supervisory employee of Suffolk County under color of state law.

157.    As a result of Lt. Hasper's unconstitutional actions, Plaintiffs have suffered harm, including loss of earnings and emotional pain, humiliation, mental anguish, loss of enjoyment of life, and emotional distress.

### AS AND FOR AN ELEVENTH CAUSE OF ACTION
### (Both Plaintiffs' Claim of a Denial of Equal Protection in Violation of 42 U.S.C. § 1983 Against Suffolk County)

158.    The allegations set forth in paragraphs 1 through 157 are incorporated by reference as if fully set forth herein.

159.    Suffolk County acted at all times under color of state law.

160.    Suffolk County has a policy and/or practice of transferring male employees who engage in sexual harassment of females, instead of taking action to prohibit further sexual harassment by such employees, in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

161.    As a result of Suffolk County's unconstitutional policy and/or practice, Plaintiffs have suffered harm, including loss of earnings and emotional pain, humiliation, mental anguish, loss of enjoyment of life, and emotional distress.

WHEREFORE, Plaintiffs request that this Court:

1.      Issue a declaratory judgment declaring that defendants have discriminated against plaintiffs on the basis of sex, as prohibited by Title VII, the New York Human Rights Law, and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution;

2.      Issue a permanent injunction prohibiting defendants from engaging in the illegal and discriminating conduct alleged herein;

3.      Award equitable relief to plaintiffs in the form of back pay and benefits to make plaintiffs whole;

4.      Award compensatory damages to Plaintiffs in an amount to be determined at trial;

5.      Order Defendant Lt. Hasper, personally, to pay punitive damages to Plaintiffs in an amount to be determined at trial;

6.      Order Defendants to pay the costs of suit, including reasonable attorney's fees and expert fees pursuant to 42 U.S.C. § 2000e-5(k) and 42 U.S.C. § 1988; and

7.      Grant such other and further relief as the Court deems just, proper, and equitable.

ELIZABETH COSGROVE and

LAURIE SALERNO

By: _Stephen L O'Brien (3153)_
Stephen L. O'Brien, Esquire
O'Brien & O'Brien, LLP
168 Smithtown Boulevard
Nesconset, NY  11767
Telephone:  (631) 265-6660
Facsimile:  (631) 265-3991
E-Mail:  stephen@oboblaw.com
Attorney for Plaintiffs

EXHIBIT "A"



## POLICE DEPARTMENT, COUNTY OF SUFFOLK, NY
### ACCREDITED LAW ENFORCEMENT AGENCY
## RESIGNATION OF MEMBER
PDCS-1038b

**INSTRUCTIONS:**   Complete and forward, via chain of command, to the Police Commissioner or his designee.

**DISTRIBUTION:**   Original - Personnel Section

| MEMBER'S NAME (LAST, FIRST, MIDDLE) | TITLE /RANK | SHIELD NO. | COMMAND NO. | SOCIAL SECURITY NO. |
|---|---|---|---|---|
| Cosgrove, Elizabeth | Sr. Clerk Typist | — | 5331 | 093-56-383~ |

I hereby resign as a member of the Department. This act is voluntary upon my part and of my own free will and accord.

This resignation is to take effect on _____11/21/09_____ at _____0001_____ hours for the
following reasons:                            (month - day - year)

Because of the ongoing harrassment caused by Lt. Hasper
& my recent transfer to Records causing stress in my work place
life & my home life. As well as him interfering with my personal li~
I have to resign from my position with SCPD.

Elizabeth Cosgrove 11/20/09                    Maureen A. Looby 11/20/09
MEMBER'S SIGNATURE & TODAY'S DATE              SIGNATURE OF MEMBER'S C.O. & TODAY'S DATE

**DIVISION C.O.:**   CHARGES PENDING   ☐ YES   ☒ NO   ☐ APPROVED   ☐ DISAPPROVED (State reasons)

Edward John Webb Johnson 11/20/09
SIGNATURE OF DIVISION C.O. & TODAY'S DATE

**POLICE COMMISSIONER OR DESIGNEE:**

RESIGNATION IS ACCEPTED on _____11/20/09_____ at _____1500_____ HOURS

RESIGNATION IS DISAPPROVED on _____ at _____ HOURS

PERSONNEL SECTION PREPARE PERSONNEL ORDER _____ 11/20/09
                                            SIGNATURE & TODAY'S DATE

EXHIBIT "B"

**Employee Rights Form**
(For Complainant)

Please read each item and place your initials at the end of each statement to indicate that you have read and understood each item.

I, *ELIZABETH COSGROVE*   acknowledge the following:

1. Any Suffolk County Employee who believes that he/she has been subjected to sexual harassment or to unlawful discrimination based on his or her race, creed, color, sex, age, national origin, disability, marital status, or sexual orientation may file an internal complaint through his or her department's designee. Written complaints will be investigated within ninety (90) days of receipt of complaint form. *EC*

2. Any individual who files such a complaint and believes that he/she is being retaliated against for having filed the complaint should notify his or her designee immediately. Retaliation against a complainant or witness is prohibited under county regulations as well as under state and federal laws. *EC*

3. I have been advised that I have the right to contact a union representative for assistance at any time during the investigative process. If I request it, a union representative may be present during my interviews with the designee or other county officials. *EC*

4. I have been informed of my right to retain private counsel at my own expense. However, I understand that I will be expected to respond to all inquiries directly and not through my attorney during the course of the investigation. *EC*

5. I understand that I am not entitled to representation by the Suffolk County Attorney's Office (Dept. of Law) during this process. *EC*

6. I understand that the County Executive Office will review the findings of the investigation as well as the recommendation of the Department Head to insure that due process was afforded to both parties. *EC*

7. I have been advised that the filing of an internal complaint is not a waiver of my right to file a formal complaint of unlawful discrimination with the NY State Division of Human Rights, the US Equal Employment Opportunity Commission (EEOC), the Federal Courts or the State Courts. *EC*

16B

8.   I have been further advised that the filing of an internal complaint does not affect the statute of limitations set forth within state and federal law and that, if I choose to file a verified complaint with an outside agency, such a complaint must be filed with the EEOC within 240 days of the alleged incident and with the NY State Division of Human Rights within one year of the alleged incident.

9.   In addition, I am further advised that should I wish to proceed in either agency or court, I must file a Notice of Claim within 90 days of the alleged incident.

Date: 12/8/09

Signature: Elizabeth Cosgrove

17B

EXHIBIT "C"

## SEXUAL HARASSMENT COMPLAINT FORM

Note:   All information provided will be handled as CONFIDENTIAL to the extent possible.  However, it may be necessary to contact the individuals named and/or to reveal some of the information contained in your complaint in order to insure a thorough investigation of this matter.

Sexual Harassment includes unwelcome sexual advances, requests of sexual favors, and other verbal or physical conduct of a sexual nature when:

1. submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment; or

2. submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; or

3. such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

### General Information:

1.    Name: _ELIZABETH  COSGROVE_    Job Title: _SENIOR  CLERK_

   Department: _SUFFOLK County P.D._  Location: _CENTRAL  ISLIP_

Phone: _631-553-2527_    How long have you worked in this department? _7 YRS_

Name and title of your supervisor: _LT.  HASPER_

2.    Name of Person you are complaining about: _LT.  HASPER_

   Job title: _LT._    Department: _SUFFOLK County P.D._

   Location: _CENTRAL ISLIP_    Phone: _631-853-4569_

How long has this person been with the department? _16 YEARS_

Does this person have any supervisory authority over you? _HE DID_

## Details of Complaint:

1. Original/First date of harassment: _____

2. Date of most recent incident *Thurs Dec 10th 2009*

3. Have the actions been: Physical *Yes*   Verbal *Yes*   Other (Specify) *Yes*

*LT. HARPER ABUSED HIS AUTHORITY BY FORCING ME TO DO THINGS AGAINST MY WILL!*

4. Please describe in detail the problem you have been experiencing. Be specific and include incident dates. Attach additional sheets if necessary.

   *See attached*

   _____
   _____
   _____

5. Has any adverse employment action been taken against you (demotion, written reprimand, etc.)? *Yes*   If so what and when?
   *Written reprimand 2X*

   _____
   _____

6. Were there any witnesses?  If so, please list each one's name, job title, job location, phone number, and what they may have seen and/or heard. *Mazza*
   *Yes P.O. Salerno, Dridget, Billy Mazza*
   *Vinny Calcaterra, Linda Zarner*

   _____

7. Have you witnessed anyone else being treated in the same manner? *Yes*
   If yes, give their names, job titles and phone numbers and

   details of what you saw and/or heard.
   *Nidia*

   _____
   _____

14B

8.  Have any other employees told you that they had similar experiences with the
individual you are complaining about? *YES*   If yes, give names, job titles
and phone numbers.

    _____
    _____
    _____
    _____

9.  Did you complain to anyone about the treatment you have been subjected to?
    *YES* If yes, give names, job titles and phone numbers, date you complained
and what action, if any, was taken by the person you complained to: _____
    *People in court, friends, family*
    *Union reps and even*
    _____

10. Have you filed a complaint with any outside agency, union, or court? _____ If
yes, with what agency?_____ What is the current
status?_____

11. Do you have any papers, records, or documents to support your case? _____
(If yes, please attach copies along with appropriate explanations)

12. How do you think this problem can be resolved?
    *It Asner needs to be put in*
    *Headquarters where he can be*
    *watched and not supervise*
    *civilian or police officers that are female*

13. What reasonable remedy are you seeking?
    *I resigned the job almost a month ago*
    *and he is still asking information on*
    *me and my boyfriend in personal nature. I'm*

**Please note:** It is a violation of State and Federal law, as well as county regulations, to *in fear*
retaliate against an individual because he/she filed a sexual harassment complaint. If you *for my*
are subjected to any adverse action that you feel may be retaliatory, you should promptly *safety.*
report it to your departmental designee.

Date: *12/21/09*  Signature: *Elizabeth Cosgrove*

Date: _____   Received By: _____

15B

Question #4

Lt Hasper kept pressuring me to go to lunch after I received an upgrade to Senior

Clerk Typist. I didn't want to go; I kept saying I need to go home to lunch for my son.

He said he was taking all the ladies in the office. When I came down to the front

office, Joan Monteserrato said to me, "he said he just wants you". I told her I did not

want to go alone with him and she repeated that he made it clear he only wanted me

to go. I wanted to take my own car, he told me we were going in his unmarked

police car. I did not feel comfortable. We went to the Peter Pan diner. After eating,

he talked to some people at the diner that worked there. Then we left the diner and

he started driving. It didn't look like the same way back to work. I started getting

nervous. Then we were driving down by the water I think somewhere in Bay Shore

or Brightwaters. He pulled into a driveway, said it was a Politian's house and he was

friends with him. Then he knocked on the front door, with no answer, he got back in

the car and said to me "someday this will all be yours". Liz, if you treat me right, I'll

do the right thing by you. I started freaking out, to me this meant he wanted me to

perform a sexual act on him. I said we should get back to work. I just wanted to get

back, I was scared. About a month or so later I needed to ask him for a tour change

due to a second job I had to get to keep me and my family surviving. I told him my

personal business why I needed the tour change. I told him personnel things about

my son and my ex husband , who does not help with the children and why I needed

the tour change. I told him this is my personnel business and did not want it

discussed in the office. Lt Hasper said let me think about it and I will get back to you. About a month went by, I asked Joan if the boss was in because we never know if he is coming in. Joan said if it's about changing your hours, the boss told me to tell you "you are not getting them". I never spoke to Joan about this. Lt. Hasper came by me to talk to State employee Bridget Paterno regarding rap sheets, when he came out of her office he sarcastically said to me, how's everything in Liz's little world? I told him I would appreciate it if you didn't tell my personnel business. He said he didn't. Then he came back an hour later and said Joanie said you told her. I said I never spoke to her regarding my personnel life. He said let's go discuss this with Joanie in my office. I started following him down the hall to his office, we were by the jury benches. He turned and grabbed my arm above the elbow to stop me. Red in the face in a nasty tone of voice he said, what do you think this is going to prove? This isn't going to prove anything. I started to cry and went back to my desk. PO Schneider had said to me, in front of people, "you ain't getting your hours, just give him a blow job and you'll get whatever you want.

The second time I asked for a change was around 2/9/09. After being asked to enter warrants in the system, after MJ a State employee, who leaves work by noon, was gone for the day and asked by State supervisors Vinny, John and George why police personnel were not putting them in. Vinny went to speak with Lt Hasper and he told me the Lt did not want me to do it. On 7/27/09, I went into Lt Hasper to ask for a tour change again. He began talking down to me and said, I should ask my ex husband for more money or take him back to court since they are his children too. He asked me how I was able to pay my bills the year before. I had to tell him my

child support was lowered because my daughter goes away to school. This questioning was inappropriate and demeaning to me. Lt Hasper then asked to speak to my TSA supervisor to see if I was lying about flight changes at the airport. He then said I could not get my hours changed. I took ½ hour annual leave every Friday so I could go to my second job. Everyone in the office is allowed to leave for Doctor appointments, car repairs, personal business without using any leave.

Some lengthy phone calls were brought to my attention by Lt. Hasper. He said Chief Moore called him about this. He asked me if I knew anyone at the NY police academy. I said yes. He said who? I said a friend. He said male or female? I said a friend. He said who is she. I said a friend. He said to me this is in Chief Moore's hands and you are lucky if you have a job at the end of the day. He went back into his office and called Manny into his office, then called me in. He got loud and his face got red and said Liz, you know what you are, you are a liar. I said back to him , I am not a liar. Lt said what you need is a good spanking and you just got spanked. You need to get spanked. I could not believe he would speak to an adult woman like this and if I was being reprimanded I should have been able to have union representation.

A day or so later I was informed by the union that I was being transferred. Before I got transferred, I asked to speak to Capt. Nieves to apologize and to explain about the phone calls. I had also offered to pay for them. I was not allowed to speak with him. I have been in the unit for more than 3 years, never had a problem with Lt. Petrowski. My job was done by two people. I have been working alone for about

two years, and I was able to eliminate the overtime entering tickets nor have I been behind on my work.

After my transfer to central records Lt. Hasper overheard a conversation by Monica and Betty that they saw me at night at a carvel with my friend. He started questioning them about my friend. After my phone calls, he called internal affairs in the city about my friend that they should investigate him and take action against him. He brought a female internal affairs Sgt out with a photo spread with supposedly my friend in it. I don't know if they were able to pick him out. Why is my friend's job being interfered with if I am the employee of Suffolk County and he is not. He also brought Internal Affairs into the café to ask a legally blind lady who runs the café Pam Kaleita, asking her if she would give a statement about me and my friend. As late as Thursday Dec 10th, Lt Hasper went back into the café and asked the lady again if she had any dirt on Liz or her friend saying you have to have something. She said to him you got what you wanted Liz is gone, so why don't you just leave the poor girl alone. He stormed out of the café. She said she is truly afraid of this man. I am now resigned from the dept a month because of this man, and he is still interfering with my life and my friend's life. I am truly scared of my safety and my new career. I want to know when the department will take responsibility for this very disturbed man.

EXHIBIT "D"

TO:  Lt. Holvik
      Suffolk County Police Dept. Internal Affairs

From:  Elizabeth Cosgrove
       631.553.2527

Date:  March 3, 2010

Total pages:  11

I am forwarding to you this document that was submitted to Sgt. Nancy
Bynes the beginning of January 2010.  I spoke with St. Byrnes last week
regarding the status of this investigation and she told me she has not started
interviewing as of yet.  I think she had ample time to at least start this
investigation and would like you to check on the status of this complaint,
since I believe she is not handling the compliant correctly.  You can reach
me at the above phone number, and I do appreciate your attention with this.
Thank you.

Who is this person Lt. Bill Hasper?

This is my story, the true facts of the happenings, goings on, occurrences, events, or whatever you want to call them of the SCPD Police Liaison office  Believe my story or not, it's totally up to you. I really don't care one way or another. I am no longer part of the corrupt SCPD that would let this person get away, once again, with whatever he wants. I am not going to sit here and feel interrogated answering question by question knowing after all is said and done, my story will get filed away with all the other stories and Lt. Hasper will once again be untouched.

I want to start by saying that I am a good, decent, hard working, single mother of two children. My dad was a WWII vet who raised his children with high values and morals. He took his kids to church on Sunday and he taught his children to "always do the right thing" and to treat people with respect. I taught a religion class for my children for 8 years and am still actively involved with my church to this day. I raise my children with the same values my parents had. My daughter is a junior at Geneseo majoring in Bio-Chem, looking at med schools. My son is a junior at Hauppauge High School. If you are a parent you can understand the struggles of raising children. I unfortunately went through a divorce 7 years ago and have been struggling to be a good parent, working hard to maintain our lives here in Hauppauge. All was going well until Lt. Hasper stepped into our office. He turned the entire office against one another. For example, while I was working up front for Joanie, helping Betty Bunton with the bail,, Lt. Hasper called me into his office and said, "why don't you tell Betty you are going back to your desk now just to piss her off". I told him that I didn't think that was a good idea to do, and continued working at Joanie's desk. He had the entire office going against one another. He continually let it be known of his "political" connections and how he was "untouchable".  Betty Bunton came into work that day at 10:30 and signed the book for 8:00 am.

Before Lt. Petrowski retired, I had a desk audit for an upgrade to Senior Clerk Typist. Shortly after Lt. Hasper's arrival, I received the upgrade. He has told people in the court that it was his doing that I got the upgrade, when he had nothing at all to do

with my promotion. It was at this time he offered to take me and the other ladies in the office to lunch. It was supposed to be all the women, not me alone, like it turned out to be.

Lt Hasper kept pressuring me to go to lunch after I received an upgrade to Senior Clerk Typist. I didn't want to go; I kept saying I need to go home to lunch for my son. He said he was taking all the ladies in the office. When I came down to the front office, Joan Monteserrato said to me, "he said he just wants you". I told her I did not want to go alone with him and she repeated that he made it clear he only wanted me to go. I wanted to take my own car, he told me we were going in his unmarked police car. I did not feel comfortable. We went to the Peter Pan diner. After eating, he talked to some people at the diner that worked there. Then we left the diner and he started driving. It didn't look like the same way back to work. I started getting nervous. Then we were driving down by the water I think somewhere in Bay Shore or Brightwaters. He pulled into a driveway, said it was a Politian's house and he was friends with him. Then he knocked on the front door, with no answer, he got back in the car and said to me "someday this will all be yours". Liz, if you treat me right, I'll do the right thing by you. I started freaking out, to me this meant he wanted me to perform a sexual act on him. I said we should get back to work. I just wanted to get back, I was scared. About a month or so later I needed to ask him for a tour change due to a second job I had to get to keep me and my family surviving. I told him my personal business why I needed the tour change. I told him personnel things about my son and my ex husband , who does not help with the children and why I needed the tour change. I told him this is my personnel business and did not want it discussed in the office. Lt Hasper said let me think about it and I will get back to you. About a month went by, I asked Joan if the boss was in because we never know if he is coming in. Joan said if it's about changing your hours, the boss told me to tell you "you are not getting them". I never spoke to Joan about this. Lt. Hasper came by me to talk to State employee Bridget Paterno regarding rap sheets, when he came out of her office he sarcastically said to me, how's everything in Liz's little world? I told him I would appreciate it if you didn't tell my personnel business. He said he

didn't. Then he came back an hour later and said Joanie said you told her. I said I never spoke to her regarding my personnel life. He said let's go discuss this with Joanie in my office. I started following him down the hall to his office, we were by the jury benches. He turned and grabbed my arm above the elbow to stop me. Red in the face in a nasty tone of voice he said, what do you think this is going to prove? This isn't going to prove anything. I started to cry and went back to my desk. PO Schneider had said to me, in front of people, "you ain't getting your hours, just give him a blow job and you'll get whatever you want.

The second time I asked for a change was around 2/9/09. After being asked to enter warrants in the system, after MJ a State employee, who leaves work by noon, was gone for the day and asked by State supervisors Vinny, John and George why police personnel were not putting them in. Vinny went to speak with Lt Hasper and he told me the Lt did not want me to do it. On 7/27/09, I went into Lt Hasper to ask for a tour change again. He began talking down to me and said, I should ask my ex husband for more money or take him back to court since they are his children too. He asked me how I was able to pay my bills the year before. I had to tell him my child support was lowered because my daughter goes away to school. This questioning was inappropriate and demeaning to me. Lt Hasper then asked to speak to my TSA supervisor to see if I was lying about flight changes at the airport. He then said I could not get my hours changed. I took ½ hour annual leave every Friday so I could go to my second job. Everyone in the office is allowed to leave for Doctor appointments, car repairs, and personal business without using any leave.

Some lengthy phone calls were brought to my attention by Lt. Hasper. He said Chief Moore called him about this. He asked me if I knew anyone at the NY police academy. I said yes. He said who? I said a friend. He said male or female? I said a friend. He said who is she. I said a friend. He said to me this is in Chief Moore's hands and you are lucky if you have a job at the end of the day. He went back into his office and called Manny into his office, then called me in. He got loud and his face got red and said Liz, you know what you are, you are a liar. I said back to him , I am not a liar. Lt said what you need is a good spanking and you just got spanked. You

need to get spanked. I could not believe he would speak to an adult woman like this and if I was being reprimanded I should have been able to have union representation.

A day or so later I was informed by the union that I was being transferred. Before I got transferred, I asked to speak to Capt. Nieves to apologize and to explain about the phone calls. I had also offered to pay for them. I was not allowed to speak with him. I have been in the unit for more than 3 years, never had a problem with Lt. Petrowski. My job was done by two people. I have been working alone for about two years, and I was able to eliminate the overtime entering tickets nor have I been behind on my work.

After my transfer to central records Lt. Hasper overheard a conversation by Monica and Betty that they saw me at night at a carvel with my friend. He started questioning them about my friend. After my phone calls, he called internal affairs in the city about my friend that they should investigate him and take action against him. He brought a female internal affairs Sgt out with a photo spread with supposedly my friend in it. I don't know if they were able to pick him out. Why is my friend's job being interfered with if I am the employee of Suffolk County and he is not. He also brought Internal Affairs into the café to ask a legally blind lady who runs the café Pam Kaleita, asking her if she would give a statement about me and my friend. As late as Thursday Dec 10th, Lt Hasper went back into the café and asked the lady again if she had any dirt on Liz or her friend saying you have to have something. She said to him you got what you wanted Liz is gone, so why don't you just leave the poor girl alone. He stormed out of the café. She said she is truly afraid of this man. I am now resigned from the dept a month because of this man, and he is still interfering with my life and my friend's life. I am truly scared of my safety and my new career. I want to know when the department will take responsibility for this very disturbed man.

While Lt. Petrowski was in charge, there was never any problems or situations in the office . I worked in the back office with Joan Monteserrato on parking tickets.

When I started, the drawer had approximately two years of backed up parking tickets that needed to be entered into the computer. Overtime was allowed to "catch up". Joan was Senior Clerk Typist and in charge of giving out overtime to Betty Bunton, Monica, Sandy and me. I was told by Joanie to work "slow" and take my time so the overtime would be around for a long time. Joanie and I would take our morning and afternoon break in the front office, every day. After Lt. Hasper started working, that all stopped. Coming up front was no longer "taking a break" it was dealing with him and his antics and I started staying in the back. I remember when he first came he held meetings and in one of his "speeches" said to us "you cover my ass, and I'll cover yours". I thought this was a little strange hearing this from a superior, since I never do anything to have to "cover my ass". Made me think what this person was all about to have to say something like that. Going up front for break was no longer taking a break. I remained in my area.

After Lt. Petrowski retired, Joanie was sent up front to work. They never replaced her position working in the back with me on entering the parking tickets. I was able, on my own, to deplete the entire backlog on tickets. On my own, without overtime. This infuriated Betty Bunton. Lt. Hasper told me he did not know why she was constantly in his office complaining about me. He said it was obvious she did not like me and he asked me if I knew why. I told him it was probably because I took the overtime out of parking tickets. (Shouldn't this be a good thing regarding the country financial situation)? I guess not. Also, George Bove said there were a lot of mistakes being made. I couldn't understand how I was making these mistakes, since I was doing the job for so long. I asked him to give me the dates that were coming up and it was during this time my dad had passed away and I was not in the office. He realized it was Betty doing these wrong entries and nicknamed her "nimble fingers". During this time, PO Lori Solorno's investigation was going on and the whole office was very tense. One day Lt. Hasper came to the back office where I was working and PO Solorno was talking to me regarding rap sheets. He saw us talking and immediately stopped in his tracks and said he would come back later. I thought that was a little strange of him. A while later when he came back, he said to me "I

didn't know you were friends with Lori". I told him I try to be friends with everyone. He turned and walked away. I do not know what he came back there in the first place.

A few months after the lunch with Hasper, it was April 2008 when I started working part time for Transportation Security Administration, as a Transportation Security Officer at MacArthur to make extra money, being a single mother raising two children, one in college. I just needed to pay my bills, like everyone else.   It was imperative I work this job to survive on Long Island. My job with the county was all up to date and I was looking for other job responsibilities I could do. Joanie told me to be quiet, cause Betty will make me work up front with them. I told her I was bored in the back and wouldn't mind "working". I was so far ahead with the parking tickets that the court personnel, George, Pat Angeles told me to "stop" entering tickets. I was too far ahead. All my work was up to date. I was bored. I asked Lt. Hasper if I could please change my working hours from 8 x 4 to 7 x 3. I told him personnel business regarding my home life, my son, and why I needed the tour change  He asked me how he could justify the change and I explained to him that I could, in addition to removing warrants from the system, do the entry on them as well. Entering warrants is now done by MJ a court worker. I asked him if I could come in earlier (since she starts at 6 am) to learn that part of warrants and help her enter them. I also told him detectives and court personnel were asking me to enter them after MJ leaves at noon. There was no one there to enter them after she left. Court supervisors, Vinny Calcaterra, John Venere, George Bove know how but felt it the responsibility should be done by police not court personnel.  Lt. Hasper told me he would get back to me. He never did. While I waited for a answer, PO Schneider told me one day "just give him a blow job, if you want your hours changed.

I waited a few weeks, when I asked Joanie if the Lt. was in that I needed to speak with him. Her response was "if it's about changing your hours he told me to tell you you are not getting them". I was shocked to here her tell me this and asked her how she knew and she told me he told her, and he told her everything we spoke about, my personal business and why I wanted the tour change.  I never went into him to

discuss this, but after a few days Lt. Hasper came in the back to speak to Bridge
Pertone regarding the rap sheets. He continued telling her all about the Lori Solerno
episode and how she tried to do this and that to him and how she never had a leg to
stand on. I heard Bridget tell him more than once that all that was not relevant to
the rap sheets and she didn't need to know about that. He just kept going on and on.
When he came out of Bridget's office, he came over to me and asked "How is
everything is Liz's world?" I told him I did not appreciate him telling Joanie my
personnel business. He looked at me and said "I didn't tell her" . I told him she told
me you did. He went up front and an hour later came back and said that Joanie just
said that to keep me quiet. I did not understand. He said to me why don't we go up
front and you me and Joanie sit in my office and discuss this. I said "absolutely".
While walking up front, we were by the jury benches in the hall, he grabbed my arm
and stopped me short saying to me, "what do you think this is going to prove?" I
said back to him, "what do you mean? You are the one who suggested we talk with
Joanie". He proceeded to belittle me in the hallway, I started to cry and turned and
went back to my desk.

Vinny Calcaterra went to speak to Lt. Hasper regarding the warrants and how police
personnel should be doing them. After their meeting Vinny told me how agitated
Hasper got when he brought up the fact that I should be doing the warrants with MJ.
Vinny told me how unprofessional the Lt. got with him and was also surprised by
the way he handled himself.

During this whole time, the entire office was running pretty much on its own. Lt.
Hasper would show up whenever he did, Betty Bunton is never in the office before
8:30 am her start time is 8:00 am. Everyone in the office except for PO Solerno were
allowed to come and go for Doctor appointments, car repair and whatever
personnel things came up and NEVER TOOK THE TIME OFF. When I asked to
change my tour I had to use my annual leave. I had to report to someone when
leaving for lunch when everyone else didn't.

While working one afternoon, PO Whittiker came to the back looking for paperwork. We both were talking, I was printing labels and he was going through the desk looking for paperwork very distracted. I told him my friend just got diagnosed with brain cancer and I was taking an hour off early to go visit her. I already had the hour off on my T&A when I left. PO Whittiker could not find the paperwork and Betty Bunton came down to look for it and asked where I was. He said he did not know. Lt. Hasper came down and asked the court people and Carmella said she is right there and turned to my area. She told him "she was right there". That is when Betty Bunton blew the whole situation out of proportion and the next day I was displined by Lt Hasper. Why was I being punished and not everyone else? I recorded every hour I took. You just need to check people's time. When both union reps came to the office to discuss what happened, I was not allowed in the office with them. Jeanie came out after over an hour all flustered and said "oh my God" he is something else. She said he started talking about PO Solerno and what sexual things she does with her dogs. Her and Ben heard this.

I got in touch with union rep Ben, to discuss the situation. I explained the situation with him regarding my hours and he said (and everyone I spoke with ) said he thought what I was asking for did not seem like a big deal. It was a hardship for me, working two jobs, and said he would look into it. I was willing to take on more responsibilities. He also said to me, I heard a lot of things about this guy and we have to take the situation slow, handle it with kid gloves. Every time Hasper's name is brought up I have never heard one good thing about him. Who is this guy and why is he getting away with what he does. Why are so many people afraid of him. People have told me he is a very dangerous man. Weeks went by and I did not hear from Ben. When I called him, he told me he was still looking into it. After a few other attempts to get in touch with him, I finally asked if there was any other union rep there and they put me in touch with Jeanie who has been very helpful in getting me to come forward with this whole ordeal. I also sent a 42 to Capt Nieves to discuss my situation and never got a reply to it.

And this is when the phone calls to the NYPD Academy came about. After feeling like I was getting the run around from everyone at the SCPD, I was reaching out and no one wanted to help me, I placed a few calls to a friend of mine in the academy. He knew of my situation with Hasper and tried to help me. Those calls to my friend were only made at my most desperate time. I felt so lost with no where to turn. My second job was being threatened, I felt terrified of saying anything because of Hasper's reputation. Those calls to my friend were out of desperation and need. I never called there prior to this whole stressful situation. When Hasper approached me he asked if I knew anyone in the NYPD academy, I honestly answered yes. He repeatedly asked me who she was. I told him a friend. He asked me again, who is SHE? Why was it so important to him to know if it was a male or female? He then told me it as out of his hands and Capt Nieves was looking into it and then told me "You are lucky if you still have your job by the end of the day". He then told me to come into his office, with Manny ,and proceeded to yell and belittle me saying I am a liar and I need to be spanked. I could not believe what I was hearing coming out of his mouth.

You can only imagine how upsetting this was to hear. All because I was reaching out for help after being rejected by everyone in the police dept. I asked to apologize to Capt Nieves and to reimburse the county for the calls, but he told me it was too late.

Lt. Hasper overheard Betty and Monica talking about me and my friend. The night before they had seen me and my friend together and Betty and Monica were talking about it in the office. Lt. Hasper called the NYPD Internal Affairs and demanded someone come out with pictures of my friend so Betty and Monica could identify him. He placed numerous calls to the city IA to pursue this. Again, this was strange behavior on his part.

To add to the humiliation and stress he caused, Lt Hasper had me transferred to Central Records. It was the final blow to me, and I knew I had to leave the county. My career with the county was over and my reputation was ruined. He won. He got me to quit. Never in all my working career did I ever experience anyone so

damaging. He bragged to court workers that he had me sent to a place where a thumb was over my head watching me.

A month after I left, Pam Kaleita, owner of the café at the court house told me he was in her store asking questions about me and my friend. She told him that he got his way, I was no longer working there and told him why don't you leave the poor girl alone. She said she is fearful of him. Said he would not give up asking her questions about me. When she told him nothing, he left. The next day the Board of Health came to visit her. She told me she is sure he called them on her.

So, when will it end? Do I have to fear for my safety and my families' safety? Why can't someone stop him or at least send him somewhere that has a thumb over his head watching him. He needs it.

EXHIBIT "E"

**COUNTY OF SUFFOLK**



STEVE LEVY
COUNTY EXECUTIVE

RICHARD DORMER
POLICE COMMISSIONER

**POLICE DEPARTMENT**

April 9, 2010

Elizabeth Cosgrove
10 Schneider Lane
Hauppauge, NY  11788

Dear Ms. Cosgrove,

I would like to take this opportunity to offer you reinstatement to the position of Senior Clerk Typist at the Court Liaison Bureau.   There have been recent staffing changes, including assignment of a new Commanding Officer.

Should you wish to accept my offer of reinstatement, please contact Maureen Looby, Administrator III, Human Resources Bureau, at  852-6213.

We look forward to hearing from you.

Very truly yours,

Richard Dormer
Police Commissioner

RD/mal





***ACCREDITED LAW ENFORCEMENT AGENCY***
www.suffolkpd.org
30 YAPHANK AVENUE, YAPHANK, NEW YORK 11980 – (631) 852-6000

EXHIBIT "F"

## DISCRIMINATION COMPLAINT FORM

**Note:** All information provided will be handled as CONFIDENTIAL to the extent possible. However, it may be necessary to contact the individuals named and/or to reveal some of the information contained in the complaint in order to insure a thorough and fair investigation of this matter.

### General Information:

1. Name: _Laurie A. Salerno_ Job Title: _Police Officer_

Department: _Suffolk County Police Dept_

Location: _Court Liaison_

Phone #: _____ How long have you worked in this department? _8 years Court Liaison_

Name and title of your supervisor: _Lt. William Hasper_  _In my 20th year at SCPD_

2. Name of Person you are complaining about : _Lt. William Hasper_

JobTitle: _Lt._  Department: _Court Liaison_

Location: _1st District Crt._  Phone: _____

How long has this person been with the department? _8 months Court Liaison_

Does this person have any supervisory authority over you? _Yes_

### Details of Your Complaint:

1. Original (first) date of discrimination _8/07_

   Most recent date of discrimination _5/2/08_

2. Please indicate the reasons(s) you believe you have been treated differently from others: _Treated differently, every time I took action as a union delegate he made officers pay consequences or myself. My initial tour was changed illegally._

(Check all that apply) _paper work missing from my personnel folder_
  X  Sex  _secretly kept papers against me_
____ National origin  _Fixing delegate election_
____ Physical/mental disability (either real or perceived)
____ Race and/or color
____ Creed/religious belief
____ Age
____ Marital status

7A

_____ Use of a guide dog
_____ Sexual orientation
__X__ Other (explain) _Union Delegate Retaliation_
_____ Retaliation

3.   Please describe in detail the problem you have been experiencing.  Be specific
     and include dates.  Attach additional sheets if necessary.

Approximately 8 or 9 yras ago subject stood outside a TUB east
bloom staring @ me. When I was done testfying he followed me
out talking to me and all the way to my car and told
me we should go out. I said no, I had a boyfriend. when
I got home he called my personal phone. I asked him he got
my # he said from the alpha listing. Now he is supervising me
creating a hostile work environment interfering w/ the
delegate duties as well as being treated differently
from men in the precinct. He is also intimidating the
civilian workers. If they talk to me he corners them +
                                                                          See
4.   Were there any witnesses?  If so, please list each name, job title, job location,   Attached
     phone number, and what they saw and/or heard.

     _____
     _____
     _____
     _____
     _____

5.   Have you witnessed others being treated in the same manner? _NO_  If yes, give
     their names, job titles and phone numbers and details of what you saw and/or
     heard.

     _____
     _____
     _____

6.   Have any other employees told you that they had similar experiences with the
     individual you are complaining about? If yes, give names, job titles and phone
     numbers.

Yes Females (3) 1st PCT 2 Females
2nd pct and has been banned from DAS
office kept going up there asking some
Young female DA's if they needed rides to their
car when they were only 100 feet away

7.   What papers, records and/or documents can we look at to prove your case?

my notes department directives
_____

     (If you have any documents to support your case, please attach copies with
     appropriate explanations).

8.   Did you complain to anyone within your Department about the treatment you
     were subjected to?_____If yes, give names, job titles, phone numbers, and date

#3 continued

and ask them what our conversation is about. Starting on March 22 he went on my computer (He has his own in his private office) and starting printing out a bouncing betty story and got onto a porn site which was on my screen when I came back to work. When I wanted a camera installed and wrote a H2 to Sgt Okula to download history to see time and dates he wouldn't let me do it he said "I think I fucked up the computer". I told him my name and code was in there and I was worried I would get into trouble. It caused severe computer problems to the point it had to come out and give me a new computer. ~~just~~ March 25 there were six large penis' inserted into a woman and still it took him several days to have this problem fixed which is very disturbing to me especially since this was on my computer. He printed out bouncing betty sheet and put this on everyones desk. ~~On Friday May 2nd.~~

#3 continued 2nd-

I WAS told in front of 3 other
officers I WAS not allowed to
wear my police sweater. I have
been wearing it for last 8 years
no one has said anything. I told
him I have a doctors note he handed
me my file nasty and said "Find it"
this was the 2nd item that was
missing from my file. I went and got
another doctors script. The next day
Saturday May 3rd he came in
and first thing Find your note
I said no. He said take your sweater
off I said I got another script.
He said we'll see I talked to
the chiefs about you and I think
you need to go out to MEU
and decide if you can wear your
sweater. This conversation took place
at about 0935. I was so stressed
having him watch over me for hours
on off that @ about a little after
11°° I went into the bathroom

you complained and what action, if any, was taken by the person to whom you complained: *Suffolk PBA Starting in August of 07*

8. Have you filed a complaint with any outside agency, union, or court? *NO* If yes, with what agency? _____

What is the status of your complaint? _____

10. How do you think this problem can be resolved? *It needs to be removed from unit*

**Please note**: It is a violation of State and Federal law, as well as county regulations, to retaliate against an individual because he/she filed a discrimination complaint. If you are subjected to any adverse action that feel may be retaliatory, you should promptly report it to your designee.

Date: *5/2/08*     Signature _____

Date: _____ Received By: _____

9A

EXHIBIT "G"

SEO-0090-02352

RECEIVED

MAY 1 2 2010

EEOC-NYDO-CRTIU

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
### INTAKE QUESTIONNAIRE

Please immediately complete this entire form and return it to the U.S. Equal Employment Opportunity Commission ("EEOC"). **REMEMBER**, a charge of employment discrimination must be filed within the time limits imposed by law, within 180 days or in some places within 300 days of the alleged discrimination. When we receive this form, we will review it to determine EEOC coverage. **Answer all questions completely, and attach additional pages if needed to complete your responses. If you do not know the answer to a question, answer by stating "not known." If a question is not applicable, write "N/A." (PLEASE PRINT)**

**1. Personal Information**

Last Name: Cosgrove    First Name: Elizabeth    MI: _____

Street or Mailing Address: 10 Schneider Lane    Apt or Unit #: _____

City: Hauppauge    County: Suffolk    State: NY    Zip: 11788

Phone Numbers: Home: (631) 630-0659    Work: (718) 977-6526

Cell: (631) 553-2527    Email Address: JB74@aol.com

Date of Birth: 2/8/60    Sex: ☐ Male ☑ Female    Do You Have a Disability? ☐ Yes ☑ No

**Please answer each of the next three questions.** i. Are you Hispanic or Latino? ☐ Yes ☑ No

ii. What is your Race? Please choose all that apply. ☐ American Indian or Alaskan Native ☐ Asian ☑ White
☐ Black or African American ☐ Native Hawaiian or Other Pacific Islander

iii. What is your National Origin (country of origin or ancestry)? U.S.A

**Please Provide The Name Of A Person We Can Contact If We Are Unable To Reach You:**

Name: Cathy Daempfle    Relationship: Sister

Address: 322 Twin Lane S    City: Wantagh    State: NY    Zip Code: _____

Home Phone: (516) 783-6678    Other Phone: (___) _____

**2. I believe that I was discriminated against by the following organization(s):** (Check those that apply)
☑ Employer ☑ Union ☐ Employment Agency ☑ Other (Please Specify) Lt. Bill Hasper

**Organization Contact Information** (If the organization is an employer, provide the address where you actually worked. If you work from home, check here ☐ and provide the address of the office to which you reported.) **If more than one employer is involved, attach additional sheets.**

Organization Name: Suffolk County Police Dept.

Address: 400 Carlton Ave    County: Suffolk

City: Central Islip    State: NY    Zip: 11722    Phone: (631) 853-4569

Type of Business: Police Dept    Job Location if different from Org. Address: _____

Human Resources Director or Owner Name: _____    Phone: (___) _____

**Number of Employees in the Organization at All Locations: Please Check (✓) One**
☑ Fewer Than 15 ☐ 15 – 100 ☐ 101 – 200 ☐ 201 – 500 ☑ More than 500 so entire P.D
Immediate Office

**3. Your Employment Data** (Complete as many items as you are able.) Are you a federal employee? ☑ Yes ☐ No   Now I am

Date Hired: in S. County 10/2003    Job Title At Hire: Clerk Typist

Pay Rate When Hired: _____    Last or Current Pay Rate: _____

Job Title at Time of Alleged Discrimination: Sr. Clerk Typist    Date Quit/Discharged: 11/09

Name and Title of Immediate Supervisor: Lt. Bill Hasper

If Job Applicant, Date You Applied for Job _____    Job Title Applied For _____

1

*See attached document.*

**4. What is the reason (basis) for your claim of employment discrimination?**

*FOR EXAMPLE, if you feel that you were treated worse than someone else because of race, you should check the box next to* Race. *If you feel you were treated worse for several reasons, such as your sex, religion and national origin, you should check all that apply. If you complained about discrimination, participated in someone else's complaint, or filed a charge of discrimination, and a negative action was threatened or taken, you should check the box next to* Retaliation.

☐ Race ☑ Sex ☐ Age ☐ Disability ☐ National Origin ☐ Religion ☐ Retaliation ☐ Pregnancy ☐ Color (typically a difference in skin shade within the same race) ☐ Genetic Information; circle which type(s) of genetic information is involved: i. genetic testing   ii. family medical history   iii. genetic services (genetic services means counseling, education or testing)

If you checked color, religion or national origin, please specify:_____

If you checked genetic information, how did the employer obtain the genetic information?_____

_____

Other reason (basis) for discrimination (Explain): _____

**5. What happened to you that you believe was discriminatory?** Include the date(s) of harm, the action(s), and the name(s) and title(s) of the person(s) who you believe discriminated against you. Please attach additional pages if needed.
*(Example: 10/02/06 – Discharged by Mr. John Soto, Production Supervisor)*

A. Date: __11\09__  Action: __Lt. Hasper forced me to resign from my position with SCPD, because I would not perform sexual acts with him.__

Name and Title of Person(s) Responsible: __Lt. Bill Hasper__

B. Date: _____ Action: _____

_____

Name and Title of Person(s) Responsible _____

**6. Why do you believe these actions were discriminatory?** Please attach additional pages if needed.

_____

_____

**7. What reason(s) were given to you for the acts you consider discriminatory?** By whom? His or Her Job Title?

_____

_____

**8. Describe who was in the same or similar situation as you and how they were treated.** For example, who else applied for the same job you did, who else had the same attendance record, or who else had the same performance? Provide the race, sex, age, national origin, religion, or disability of these individuals, if known, and if it relates to your claim of discrimination. For example, if your complaint alleges race discrimination, provide the race of each person; if it alleges sex discrimination, provide the sex of each person; and so on. Use additional sheets if needed.

Of the persons in the same or similar situation as you, who was treated *better* than you?

| Full Name | Race, Sex, Age, National Origin, Religion or Disability | Job Title | Description of Treatment |
|---|---|---|---|

A._____

_____

B._____

_____

2

Of the persons in the same or similar situation as you, who was treated *worse* than you?

| Full Name | Race, Sex, Age, National Origin, Religion or Disability | Job Title | Description of Treatment |

A. _____

_____

B. _____

_____

Of the persons in the same or similar situation as you, who was treated the *same* as you?

| Full Name | Race, Sex, Age, National Origin, Religion or Disability | Job Title | Description of Treatment |

A. _____

_____

B. _____

_____

Answer questions 9-12 <u>only</u> if you are claiming discrimination based on disability.  If not, skip to question 13.  Please tell us if you have more than one disability.  Please add additional pages if needed.

9.  Please check all that apply:     ☐ Yes, I have a disability
                                      ☐ I do not have a disability now but I did have one
                                      ☐ No disability but the organization treats me as if I am disabled

10.  What is the disability that you believe is the reason for the adverse action taken against you?   Does this disability prevent or limit you from doing anything?  (e.g., lifting, sleeping, breathing, walking, caring for yourself, working, etc.).

_____

_____

_____

11.  Do you use medications, medical equipment or anything else to lessen or eliminate the symptoms of your disability?
     ☐ Yes  ☐ No
If "Yes," what medication, medical equipment or other assistance do you use?

_____

_____

12.  Did you ask your employer for any changes or assistance to do your job because of your disability?
     ☐ Yes  ☐ No

If "Yes," when did you ask? _____ How did you ask (verbally or in writing)? _____

Who did you ask?  (Provide full name and job title of person)

_____

Describe the changes or assistance that you asked for: _____

_____

_____

How did your employer respond to your request? _____

_____

3

**13.  Are there any witnesses to the alleged discriminatory incidents?  If yes, please identify them below and tell us what they will say. (Please attach additional pages if needed to complete your response)**

| Full Name | Job Title | Address & Phone Number | What do you believe this person will tell us? |

A.

B.

**14.  Have you filed a charge previously on this matter with the EEOC or another agency?  ☐ Yes  ☑ No**

**15.  If you filed a complaint with another agency, provide the name of agency and the date of filing:**

Internal Affairs in Jan. 2010 - investigation ongoing

**16.  Have you sought help about this situation from a union, an attorney, or any other source?  ☑ Yes  ☐ No**
Provide name of organization, name of person you spoke with and date of contact. Results, if any?

A.M.E. union - civillian - They ignored my statements - Ben kept prolonging the situation

Please check one of the boxes below to tell us what you would like us to do with the information you are providing on this questionnaire.  If you would like to file a charge of job discrimination, you must do so either within 180 days from the day you knew about the discrimination, or within 300 days from the day you knew about the discrimination if the employer is located in a place where a state or local government agency enforces laws similar to the EEOC's laws.  If you do not file a charge of discrimination within the time limits, you will lose your rights.  If you would like more information before filing a charge or you have concerns about EEOC's notifying the employer, union, or employment agency about your charge, you may wish to check Box 1.  If you want to file a charge, you should check Box 2.

BOX 1  ☐ I want to talk to an EEOC employee before deciding whether to file a charge.  I understand that by checking this box, I have not filed a charge with the EEOC.  I also understand that I could lose my rights if I do not file a charge in time.

BOX 2  ☑ I want to file a charge of discrimination, and I authorize the EEOC to look into the discrimination I described above.  I understand that the EEOC must give the employer, union, or employment agency that I accuse of discrimination information about the charge, including my name.  I also understand that the EEOC can only accept charges of job discrimination based on race, color, religion, sex, national origin, disability, age, genetic information, or retaliation for opposing discrimination.

_Elizabeth Cosgrove_
Signature

_May 7, 2010_
Today's Date

PRIVACY ACT STATEMENT: This form is covered by the Privacy Act of 1974: Public Law 93-579. Authority for requesting personal data and the uses thereof are:
1) FORM NUMBER/TITLE/DATE. EEOC Intake Questionnaire (9/20/08). 2) AUTHORITY. 42 U.S.C. § 2000e-5(b), 29 U.S.C. § 211, 29 U.S.C. § 626. 42 U.S.C. 12117(a)
3) PRINCIPAL PURPOSE. The purpose of this questionnaire is to solicit information about claims of employment discrimination, determine whether the EEOC has jurisdiction over those claims, and provide charge filing counseling, as appropriate. Consistent with 29 CFR 1601.12(b) and 29 CFR 1626.8(c), this questionnaire may serve as a charge if it meets the elements of a charge. 4) ROUTINE USES. EEOC may disclose information from this form to other state, local and federal agencies as appropriate or necessary to carry out the Commission's functions, or if EEOC becomes aware of a civil or criminal law violation. EEOC may also disclose information to respondents in litigation, to congressional offices in response to inquiries from parties to the charge, to disciplinary committees investigating complaints against attorneys representing the parties to the charge, or to federal agencies inquiring about hiring or security clearance matters.
5) WHETHER DISCLOSURE IS MANDATORY OR VOLUNTARY AND EFFECT ON INDIVIDUAL FOR NOT PROVIDING INFORMATION. Providing this information is voluntary but the failure to do so may hamper the Commission's investigation of a charge. It is not mandatory that this form be used to request the requested information.

November 2009

4

Who is this person Lt. Bill Hasper?

This is my story, the true facts of the happenings, goings on, occurrences, events, or whatever you want to call them of the SCPD Police Liaison office. Believe my story or not, it's totally up to you. I really don't care one way or another. I am no longer part of the corrupt SCPD that would let this person get away, once again, with whatever he wants. I am not going to sit here and feel interrogated answering question by question knowing after all is said and done, my story will get filed away with all the other stories and Lt. Hasper will once again be untouched.

I want to start by saying that I am a good, decent, hard working, single mother of two children. My dad was a WWII vet who raised his children with high values and morals. He took his kids to church on Sunday and he taught his children to "always do the right thing" and to treat people with respect. I taught a religion class for my children for 8 years and am still actively involved with my church to this day. I raise my children with the same values my parents had. My daughter is a junior at Geneseo majoring in Bio-Chem, looking at med schools. My son is a junior at Hauppauge High School. If you are a parent you can understand the struggles of raising children. I unfortunately went through a divorce 7 years ago and have been struggling to be a good parent, working hard to maintain our lives here in Hauppauge. All was going well until Lt. Hasper stepped into our office. He turned the entire office against one another. For example, while I was working up front for Joanie, helping Betty Bunton with the bail, Lt. Hasper called me into his office and said, "why don't you tell Betty you are going back to your desk now just to piss her off". I told him that I didn't think that was a good idea to do, and continued working at Joanie's desk. He had the entire office going against one another. He continually let it be known of his "political" connections and how he was "untouchable". Betty Bunton came into work that day at 10:30 and signed the book for 8:00 am.

Before Lt. Petrowski retired, I had a desk audit for an upgrade to Senior Clerk Typist. Shortly after Lt. Hasper's arrival, I received the upgrade. He has told people in the court that it was his doing that I got the upgrade, when he had nothing at all to do

1

with my promotion. It was at this time he offered to take me and the other ladies in the office to lunch. It was supposed to be all the women, not me alone, like it turned out to be.

Lt Hasper kept pressuring me to go to lunch after I received an upgrade to Senior Clerk Typist. I didn't want to go; I kept saying I need to go home to lunch for my son. He said he was taking all the ladies in the office. When I came down to the front office, Joan Monteserrato said to me, "he said he just wants you". I told her I did not want to go alone with him and she repeated that he made it clear he only wanted me to go. I wanted to take my own car, he told me we were going in his unmarked police car. I did not feel comfortable. We went to the Peter Pan diner. After eating, he talked to some people at the diner that worked there. Then we left the diner and he started driving. It didn't look like the same way back to work. I started getting nervous. Then we were driving down by the water I think somewhere in Bay Shore or Brightwaters. He pulled into a driveway, said it was a Politian's house and he was friends with him. Then he knocked on the front door, with no answer, he got back in the car and said to me "someday this will all be yours". Liz, if you treat me right, I'll do the right thing by you. I started freaking out, to me this meant he wanted me to perform a sexual act on him. I said we should get back to work. I just wanted to get back, I was scared. About a month or so later I needed to ask him for a tour change due to a second job I had to get to keep me and my family surviving. I told him my personal business why I needed the tour change. I told him personnel things about my son and my ex husband , who does not help with the children and why I needed the tour change. I told him this is my personnel business and did not want it discussed in the office. Lt Hasper said let me think about it and I will get back to you. About a month went by, I asked Joan if the boss was in because we never know if he is coming in. Joan said if it's about changing your hours, the boss told me to tell you "you are not getting them". I never spoke to Joan about this. Lt Hasper came by me to talk to State employee Bridget Paterno regarding rap sheets, when he came out of her office he sarcastically said to me, how's everything in Liz's little world? I told him I would appreciate it if you didn't tell my personnel business. He said he

2

didn't. Then he came back an hour later and said Joanie said you told her. I said I never spoke to her regarding my personnel life. He said let's go discuss this with Joanie in my office. I started following him down the hall to his office, we were by the jury benches. He turned and grabbed my arm above the elbow to stop me. Red in the face in a nasty tone of voice he said, what do you think this is going to prove? This isn't going to prove anything. I started to cry and went back to my desk. PO Schneider had said to me, in front of people, "you ain't getting your hours, just give him a blow job and you'll get whatever you want.

The second time I asked for a change was around 2/9/09. After being asked to enter warrants in the system, after MJ a State employee, who leaves work by noon, was gone for the day and asked by State supervisors Vinny, John and George why police personnel were not putting them in. Vinny went to speak with Lt Hasper and he told me the Lt did not want me to do it. On 7/27/09, I went into Lt Hasper to ask for a tour change again. He began talking down to me and said, I should ask my ex husband for more money or take him back to court since they are his children too. He asked me how I was able to pay my bills the year before. I had to tell him my child support was lowered because my daughter goes away to school. This questioning was inappropriate and demeaning to me. Lt Hasper then asked to speak to my TSA supervisor to see if I was lying about flight changes at the airport. He then said I could not get my hours changed. I took ½ hour annual leave every Friday so I could go to my second job. Everyone in the office is allowed to leave for Doctor appointments, car repairs, and personal business without using any leave.

Some lengthy phone calls were brought to my attention by Lt. Hasper. He said Chief Moore called him about this. He asked me if I knew anyone at the NY police academy. I said yes. He said who? I said a friend. He said male or female? I said a friend. He said who is she. I said a friend. He said to me this is in Chief Moore's hands and you are lucky if you have a job at the end of the day. He went back into his office and called Manny into his office, then called me in. He got loud and his face got red and said Liz, you know what you are, you are a liar. I said back to him , I am not a liar. Lt said what you need is a good spanking and you just got spanked. You

3

need to get spanked. I could not believe he would speak to an adult woman like this and if I was being reprimanded I should have been able to have union representation.

A day or so later I was informed by the union that I was being transferred. Before I got transferred, I asked to speak to Capt. Nieves to apologize and to explain about the phone calls. I had also offered to pay for them. I was not allowed to speak with him. I have been in the unit for more than 3 years, never had a problem with Lt. Petrowski. My job was done by two people. I have been working alone for about two years, and I was able to eliminate the overtime entering tickets nor have I been behind on my work.

After my transfer to central records Lt. Hasper overheard a conversation by Monica and Betty that they saw me at night at a carvel with my friend. He started questioning them about my friend. After my phone calls, he called internal affairs in the city about my friend that they should investigate him and take action against him. He brought a female internal affairs Sgt out with a photo spread with supposedly my friend in it. I don't know if they were able to pick him out. Why is my friend's job being interfered with if I am the employee of Suffolk County and he is not. He also brought Internal Affairs into the café to ask a legally blind lady who runs the café Pam Kaleita, asking her if she would give a statement about me and my friend. As late as Thursday Dec 10th , Lt Hasper went back into the café and asked the lady again if she had any dirt on Liz or her friend saying you have to have something. She said to him you got what you wanted Liz is gone, so why don't you just leave the poor girl alone. He stormed out of the café. She said she is truly afraid of this man. I am now resigned from the dept a month because of this man, and he is still interfering with my life and my friend's life. I am truly scared of my safety and my new career. I want to know when the department will take responsibility for this very disturbed man.

While Lt. Petrowski was in charge, there was never any problems or situations in the office . I worked in the back office with Joan Monteserrato on parking tickets.

4

When I started, the drawer had approximately two years of backed up parking tickets that needed to be entered into the computer. Overtime was allowed to "catch up". Joan was Senior Clerk Typist and in charge of giving out overtime to Betty Bunton, Monica, Sandy and me. I was told by Joanie to work "slow" and take my time so the overtime would be around for a long time. Joanie and I would take our morning and afternoon break in the front office, every day. After Lt. Hasper started working, that all stopped. Coming up front was no longer "taking a break" it was dealing with him and his antics and I started staying in the back. I remember when he first came he held meetings and in one of his "speeches" said to us "you cover my ass, and I'll cover yours". I thought this was a little strange hearing this from a superior, since I never do anything to have to "cover my ass". Made me think what this person was all about to have to say something like that. Going up front for break was no longer taking a break. I remained in my area.

After Lt. Petrowski retired, Joanie was sent up front to work. They never replaced her position working in the back with me on entering the parking tickets. I was able, on my own, to deplete the entire backlog on tickets. On my own, without overtime. This infuriated Betty Bunton. Lt. Hasper told me he did not know why she was constantly in his office complaining about me. He said it was obvious she did not like me and he asked me if I knew why. I told him it was probably because I took the overtime out of parking tickets. (Shouldn't this be a good thing regarding the country financial situation)? I guess not. Also, George Bove said there were a lot of mistakes being made. I couldn't understand how I was making these mistakes, since I was doing the job for so long. I asked him to give me the dates that were coming up and it was during this time my dad had passed away and I was not in the office. He realized it was Betty doing these wrong entries and nicknamed her "nimble fingers". During this time, PO Lori Solorno's investigation was going on and the whole office was very tense. One day Lt. Hasper came to the back office where I was working and PO Solorno was talking to me regarding rap sheets. He saw us talking and immediately stopped in his tracks and said he would come back later. I thought that was a little strange of him. A while later when he came back, he said to me "I

5

didn't know you were friends with Lori". I told him I try to be friends with everyone. He turned and walked away. I do not know what he came back there in the first place.

A few months after the lunch with Hasper, it was April 2008 when I started working part time for Transportation Security Administration, as a Transportation Security Officer at MacArthur to make extra money, being a single mother raising two children, one in college. I just needed to pay my bills, like everyone else.   It was imperative I work this job to survive on Long Island. My job with the county was all up to date and I was looking for other job responsibilities I could do. Joanie told me to be quiet, cause Betty will make me work up front with them. I told her I was bored in the back and wouldn't mind "working". I was so far ahead with the parking tickets that the court personnel, George, Pat Angeles told me to "stop" entering tickets. I was too far ahead. All my work was up to date. I was bored. I asked Lt. Hasper if I could please change my working hours from 8 x 4 to 7 x 3. I told him personnel business regarding my home life, my son, and why I needed the tour change  He asked me how he could justify the change and I explained to him that I could, in addition to removing warrants from the system, do the entry on them as well. Entering warrants is now done by MJ a court worker. I asked him if I could come in earlier (since she starts at 6 am) to learn that part of warrants and help her enter them. I also told him detectives and court personnel were asking me to enter them after MJ leaves at noon. There was no one there to enter them after she left. Court supervisors, Vinny Calcaterra, John Venere, George Bove know how but felt it the responsibility should be done by police not court personnel.  Lt. Hasper told me he would get back to me. He never did. While I waited for an answer, PO Schneider told me one day "just give him a blow job, if you want your hours changed.

I waited a few weeks, when I asked Joanie if the Lt. was in that I needed to speak with him. Her response was "if it's about changing your hours he told me to tell you you are not getting them". I was shocked to here her tell me this and asked her how she knew and she told me he told her, and he told her everything we spoke about, my personal business and why I wanted the tour change. I never went into him to

6

discuss this, but after a few days Lt. Hasper came in the back to speak to Bridge
Pertone regarding the rap sheets. He continued telling her all about the Lori Solerno
episode and how she tried to do this and that to him and how she never had a leg to
stand on. I heard Bridget tell him more than once that all that was not relevant to
the rap sheets and she didn't need to know about that. He just kept going on and on.
When he came out of Bridget's office, he came over to me and asked "How is
everything is Liz's world?" I told him I did not appreciate him telling Joanie my
personnel business. He looked at me and said "I didn't tell her" . I told him she told
me you did. He went up front and an hour later came back and said that Joanie just
said that to keep me quiet. I did not understand. He said to me why don't we go up
front and you me and Joanie sit in my office and discuss this. I said "absolutely".
While walking up front, we were by the jury benches in the hall, he grabbed my arm
and stopped me short saying to me, "what do you think this is going to prove?" I
said back to him, "what do you mean? You are the one who suggested we talk with
Joanie". He proceeded to belittle me in the hallway, I started to cry and turned and
went back to my desk.

Vinny Calcaterra went to speak to Lt. Hasper regarding the warrants and how police
personnel should be doing them. After their meeting Vinny told me how agitated
Hasper got when he brought up the fact that I should be doing the warrants with MJ.
Vinny told me how unprofessional the Lt. got with him and was also surprised by
the way he handled himself.

During this whole time, the entire office was running pretty much on its own. Lt.
Hasper would show up whenever he did, Betty Bunton is never in the office before
8:30 am her start time is 8:00 am. Everyone in the office except for PO Solerno were
allowed to come and go for Doctor appointments, car repair and whatever
personnel things came up and NEVER TOOK THE TIME OFF. When I asked to
change my tour I had to use my annual leave. I had to report to someone when
leaving for lunch when everyone else didn't.

While working one afternoon, PO Whittiker came to the back looking for paperwork. We both were talking, I was printing labels and he was going through the desk looking for paperwork very distracted. I told him my friend just got diagnosed with brain cancer and I was taking an hour off early to go visit her. I already had the hour off on my T&A when I left. PO Whittiker could not find the paperwork and Betty Bunton came down to look for it and asked where I was. He said he did not know. Lt. Hasper came down and asked the court people and Carmella said she is right there and turned to my area. She told him "she was right there". That is when Betty Bunton blew the whole situation out of proportion and the next day I was displined by Lt Hasper. Why was I being punished and not everyone else? I recorded every hour I took. You just need to check people's time. When both union reps came to the office to discuss what happened, I was not allowed in the office with them. Jeanie came out after over an hour all flustered and said "oh my God" he is something else. She said he started talking about PO Solerno and what sexual things she does with her dogs. Her and Ben heard this.

I got in touch with union rep Ben, to discuss the situation. I explained the situation with him regarding my hours and he said (and everyone I spoke with ) said he thought what I was asking for did not seem like a big deal. It was a hardship for me, working two jobs, and said he would look into it. I was willing to take on more responsibilities. He also said to me, I heard a lot of things about this guy and we have to take the situation slow, handle it with kid gloves. Every time Hasper's name is brought up I have never heard one good thing about him. Who is this guy and why is he getting away with what he does. Why are so many people afraid of him? People have told me he is a very dangerous man. Weeks went by and I did not hear from Ben. When I called him, he told me he was still looking into it. After a few other attempts to get in touch with him, I finally asked if there was any other union rep there and they put me in touch with Jeanie who has been very helpful in getting me to come forward with this whole ordeal. I also sent a 42 to Capt Nieves to discuss my situation and never got a reply to it.

And this is when the phone calls to the NYPD Academy came about. After feeling like I was getting the run around from everyone at the SCPD, I was reaching out and no one wanted to help me, I placed a few calls to a friend of mine in the academy. He knew of my situation with Hasper and tried to help me. Those calls to my friend were only made at my most desperate time. I felt so lost with no where to turn. My second job was being threatened, I felt terrified of saying anything because of Hasper's reputation. Those calls to my friend were out of desperation and need. I never called there prior to this whole stressful situation. When Hasper approached me he asked if I knew anyone in the NYPD academy, I honestly answered yes. He repeatedly asked me who she was. I told him a friend. He asked me again, who is SHE? Why was it so important to him to know if it was a male or female? He then told me it as out of his hands and Capt Nieves was looking into it and then told me "You are lucky if you still have your job by the end of the day". He then told me to come into his office, with Manny ,and proceeded to yell and belittle me saying I am a liar and I need to be spanked. I could not believe what I was hearing coming out of his mouth.

You can only imagine how upsetting this was to hear. All because I was reaching out for help after being rejected by everyone in the police dept. I asked to apologize to Capt Nieves and to reimburse the county for the calls, but he told me it was too late.

Lt. Hasper overheard Betty and Monica talking about me and my friend. The night before they had seen me and my friend together and Betty and Monica were talking about it in the office. Lt. Hasper called the NYPD Internal Affairs and demanded someone come out with pictures of my friend so Betty and Monica could identify him. He placed numerous calls to the city IA to pursue this. Again, this was strange behavior on his part.

To add to the humiliation and stress he caused, Lt Hasper had me transferred to Central Records. It was the final blow to me, and I knew I had to leave the county. My career with the county was over and my reputation was ruined. He won. He got me to quit. Never in all my working career did I ever experience anyone so

damaging.  He bragged to court workers that he had me sent to a place where a thumb was over my head watching me.

A month after I left, Pam Kaleita, owner of the café at the court house told me he was in her store asking questions about me and my friend.  She told him that he got his way, I was no longer working there and told him why don't you leave the poor girl alone.  She said she is fearful of him.  Said he would not give up asking her questions about me.  When she told him nothing, he left.  The next day the Board of Health came to visit her.  She told me she is sure he called them on her.

So, when will it end?  Do I have to fear for my safety and my families' safety?  Why can't someone stop hi?.

EXHIBIT "H"

EEOC FORM 131 (11/09)

## U.S. Equal Employment Opportunity Commission

| | PERSON FILING CHARGE |
|---|---|
| Ms. Christine Malafi, County Attorney<br>**SUFFOLK COUNTY POLICE DEPARTMENT**<br>Veterans Memorial Highway, P.O. Box 6100<br>**Department of Law**<br>Hauppauge, NY 11788 | **Elizabeth Cosgrove** |

THIS PERSON (*check one or both*)

[X] Claims To Be Aggrieved

[ ] Is Filing on Behalf of Other(s)

EEOC CHARGE NO.
**520-2010-02302**

## NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act (Title VII)    [ ] The Equal Pay Act (EPA)    [ ] The Americans with Disabilities Act (ADA)

[ ] The Age Discrimination in Employment Act (ADEA)    [ ] The Genetic Information Nondiscrimination Act (GINA)

The boxes checked below apply to our handling of this charge:

1. [X] No action is required by you at this time.

2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [ ] Please provide by _____ a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. [ ] Please respond fully by _____ to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

5. [ ] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by
to
If you DO NOT wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

| John B. Douglass,<br>**Supervisory Investigator** | **New York District Office**<br>**33 Whitehall Street**<br>**5th Floor**<br>**New York, NY 10004** |
|---|---|
| *EEOC Representative* | |
| Telephone    **(212) 336-3765** | |

Enclosure(s): [ ] Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[ ] Race   [ ] Color   [X] Sex   [ ] Religion   [ ] National Origin   [ ] Age   [ ] Disability   [X] Retaliation   [ ] Genetic Information   [ ] Other

**Copy of Charge will Follow.**

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| May 18, 2010 | Spencer H. Lewis, Jr.,<br>**Director** | |

EXHIBIT "I"

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | **52O-2010-0** |

| New York State Division Of Human Rights | and EEOC |
|---|---|
| State or local Agency, if any | |

| Name (Indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| MS. ELIZABETH COSGROVE | (631)553-2527 | 2/8/60 |

| Street Address | City, State and ZIP Code |
|---|---|
| 10 SCHNEIDER LANE | HAUPPAUGE, N.Y. 11788 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | *No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| POLICE DEPARTMENT, COUNTY OF SUFFOLK | approximately 3400 | 631 852-6000 |

| Street Address | City, State and ZIP Code |
|---|---|
| 30 YAPHANK AVENUE | YAPHANK, N.Y. 11980 |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE   ☐ COLOR   ☒ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☒ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ GENETIC INFORMATION
☒ OTHER (Specify) NYSHRL and 28 U.S.C. §1983

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: April 2008   Latest: Nov. 20, 2009
☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

See attached.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

Date: 11/17/10
Charging Party Signature: *Elizabeth Cosgrove*

NOTARY – When necessary for State and Local Agency Requirements

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.
SIGNATURE OF COMPLAINANT
*Elizabeth Cosgrove*

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year)
*November 17, 2010*

STEPHEN L. O'BRIEN
Notary Public, State of New York
Qualified in Suffolk County
No. 02OB6025417
My Comm. Expires May 29, 201

STATE OF NEW YORK )
                                   )   SS.:
COUNTY OF SUFFOLK )

ELIZABETH COSGROVE, being duly sworn deposes and says:

1.      I was employed as a clerk in the Police Department County of Suffolk,

New York from March 2006 through my wrongful termination on November 20,

2009.

2.      Effective March 17, 2008 I was promoted to Senior Clerk Typist.

3.      My duties involved:

(20%) Update the status of warrants into NXView. Warrants must be
deleted to avoid arrest of defendants that have appearances for scheduled
court date. New warrants must be entered in accordance with court
docket.
(10%) File NCIS Fingerprint Response sheets according to arrest date and
police precinct for future use.
(40%) Enter past due parking tickets. Tickets must be checked for correct
VTL violation charge/fine and amended as necessary. Name of
owner/operator is obtained from use of DMV record system and then
entered into Unified Court System, labels to tag each ticket are produced.
For each ticket entered, the appropriate letter is mailed to defendant
stating charge along with a photocopy of the ticket. A court calendar is
run for future use.
(15%) Update pleas to tickets (not guilty, abated, motion) which have
been accepted at First District Court and correct court docket as
necessary.
(15%) Enter cash receipts that have been mailed or paid at Cashier's
window.

4.      At all times during my employment with the Police Department, I

satisfactorily performed the duties assigned to me.

5.      Since at least April 2008, the Police Department of Suffolk County

has engaged in unlawful employment practices, in violation of Section 703(a) of

Title VII, 42 U.S.C. §2000e-2(c)(2), by creating a sexually hostile work environment based on my sex as well as other similarly situated female employees.

6.    Upon Lt. Petrowski's retirement in April 2008, Lt. Hasper became commanding officer of the Court Liaison Office of the Suffolk County Police Department and supervisor over me.

7.    The congenial atmosphere of the Liaison Office changed with the arrival of Lt. Hasper.

8.    Rather than working to see that office staff worked in a cooperative manner, Lt. Hasper appeared to enjoy setting up office staff against one another.

9.    For example, on one occasion, Lt. Hasper suggested to me that I tell another employee, Betty Bunton, whom I was assisting, that I was returning to my desk "just to piss her off."

10.    Once Lt. Hasper was Court Liaison Commanding officer, me and other employees who worked in the back of the Court Liaison Office stopped coming to the front for breaks because we did not want to deal with the antics of Lt. Hasper.

11.    Lt. Hasper did not keep regular hours, and he told the employees in the Court Liaison Office that he was "untouchable" because of his "political connections."

12.    Lt. Hasper did not respect boundaries and treated female employees as potential sexual conquests rather than as employees of the County working on a common mission.

13.     When I was promoted to Senior Clerk Typist, Lt. Hasper told court employees that he was responsible for my upgrade, even though the arrival came about as a result of a desk audit conducted under the previous Lt., Jack Petrowski.

14.     When my promotion became effective, Lt. Hasper repeatedly pressured me to go to lunch with him to celebrate my promotion.

15.     I repeatedly turned down Lt. Hasper's invitations because I needed to go home to lunch with my son, but I agreed when he told me that he was inviting all the women in the office.

16.     Just before the group lunch was supposed to occur, another employee, Joan Monteserrato, told me that Lt. Hasper had made it clear to the other women that he only wanted to go to lunch with me.

17.     Although I wanted to drive my own car to lunch at the Peter Pan diner, Lt. Hasper insisted that we go together in an unmarked Police Department vehicle.

18.     Instead of returning to the office following lunch, Lt. Hasper drove me to the Brightwaters area, where he pulled into the driveway of a home, which he identified as the home of a politician who was a friend of his.

19.     Lt. Hasper knocked on the front door of the home, and when he got no answer he returned to the car and said, "Someday this will be all yours.  Liz, if you treat me right, I'll do the right thing by you."

20.     Lt. Hasper's statement frightened me because I interpreted his remarks to be a request that I perform a sexual act on him.

21.    About one month following the lunch incident, I requested a tour change from Lt. Hasper.

22.    I told Lt. Hasper that I needed the tour change in order to continue working a second job with the Transportation Safety Administration ("TSA") dictated by financial necessity, which I detailed for him.

23.    I explained that my reasons for requesting the tour change were personal and requested that Lt. Hasper not discuss my request with anyone else in the office.

24.    About one month later, Lt. Hasper had not made a decision on my request for a tour change, but I learned that he had discussed my request with at least one other employee, Joan Monteserrato.

25.    When I confronted Lt. Hasper about betraying my confidentiality, he reacted angrily, ordering me to discuss the matter with Joan in his office, then, when I began to follow him to his office, turning and grabbing my arm above the elbow and stating in a nasty tone of voice, "What do you think this is going to prove?"

26.    P.O. Schneider, who apparently also had learned of my request for a tour change, stated in front of other employees, "You ain't getting your hours; just give him a blow job and you'll get whatever you want."

27.    In February 2009, I proposed that I be given the responsibility of entering state warrants into the system, since the state employee who performed that function left at noon each day and state supervisors requested that police personnel enter the warrants, but Lt. Hasper turned down my request.

4

28.     One of the state supervisors, Vinny Calcaterra, reported to me that Lt. Hasper became agitated and unprofessional when he told Mr. Calcaterra that he did not want me performing that function.

29.     In July 2009, I again asked for a change of tour.

30.     Lt. Hasper responded in an inappropriate manner, telling me I should get more money from my former husband, questioning how I had paid my bills the year before, and asking to speak to my TSA supervisor to see if I was lying about flight changes at the airport.

31.     Lt. Hasper never granted my tour change, and I was required to use Annual Leave in order to leave 30 minutes early one day per week for my second job with the TSA, even though Lt. Hasper allowed other employees in the office to attend doctor's appointments, get car repairs, or run other errands without using leave.

32.     I also had to report that I was leaving for lunch, even though other employees were not required to do so.

33.     In September 2010, Lt. Hasper questioned me about some lengthy telephone calls to the New York City Police Academy and asked whether I knew anyone at the Academy.

34.     Lt. Hasper appeared peeved when he learned that my friend at the Academy was male.

35.     Lt. Hasper called me a liar in response to my answers concerning the phone calls, then told me I needed a good spanking and I just got spanked.

36.     A day or two later I was transferred to the Central Records office.

37.     Following my transfer to Central Records, Lt. Hasper apparently overheard a conversation between two Court Liaison Office employees about seeing me and my friend from the Academy at Carvel and started questioning the two women about my friend.

38.     Sometime thereafter, Lt. Hasper telephoned the New York City Police Department Office of Internal Affairs and suggested that office investigate my friend and take action against him.

39.     Lt. Hasper then asked a member of the New York City Police Department Internal Affairs to show the two employees a photo spread with my friend's picture included and asked them to identify my friend.

40.     Thereafter Lt. Hasper took a representative from the New York City Police Department Internal Affairs into a court café and asked the manager, Pam Kaleita, to give a statement about seeing me with my friend in the café.

41.     Because of Lt. Hasper's ongoing harassment of me, I was forced to resign my employment with Suffolk County on November 20, 2009.

42.     On December 10, 2009, after I had left my job, Lt. Hasper again visited the café and asked Ms. Kaleita for any "dirt" she had on "Liz and her friend."

43.     When Ms. Kaleita refused to cooperate, Lt. Hasper stormed out of the café, leaving Ms. Kaleita in fear.

44.    Lt. Hasper also made public sexual remarks about other employees in the Court Liaison Office. For example, during a meeting with union representatives Jeanie and Ben, Lt. Hasper stated that P.O. Salerno, a female officer assigned to the Court Liaison Office, performed sexual acts with her dogs.

45.    Other Court Liaison Office employees told me that Lt. Hasper had made sexual remarks and/or advances to café employees and assistant district attorneys.

46.    On December 21, 2009, I filed a written Sexual Harassment Complaint with the Suffolk County Police Department.

47.    On May 12, 2010, I complained to the EEOC about the discriminatory actions of the Suffolk County Police Department.

48.    The Police Department constructively discharged me by creating such an intolerably hostile work environment that I was forced to leave my employment with the Police Department.

49.    The effect of the practices of the Police Department has been to deprive me and other similarly situated women of equal employment opportunities and otherwise adversely affect their status as employees.

50.    The unlawful employment practices were intentional.

51.    The unlawful employment practices were done with malice or with reckless indifference to the federally protected rights of me and other similarly situated women.

52.    I am providing this affidavit to the EEOC as part of my "Charge of

Discrimination" and understand that this affidavit will be utilized by the EEOC to make findings regarding potential charges and/or a Notice of Right to Sue.

*Elizabeth Cosgrove*

ELIZABETH COSGROVE

Sworn to this _17th_
Day of November, 2010

STEPHEN L. O'BRIEN
Notary Public, State of New York
Qualified in Suffolk County
No. 02OB6025417,
My Comm. Expires May 27, 2011

# EXHIBIT "J"



**U.S. Department of Justice**

Civil Rights Division

NOTICE OF RIGHT TO SUE
WITHIN 90 DAYS

CERTIFIED MAIL
5067 9101

*950 Pennsylvania Avenue, N.W.*
*Karen Ferguson, EMP, PHB, Room 4239*
*Washington, DC 20530*

April 1, 2011

Ms. Elizabeth Cosgrove
c/o Stephen L. O'Brien, Esquire
Law Offices of O'Brien & O'Brien
Attorney at Law
168 Smithtown Blvd.
Nesconset, NY  11767

Re:  EEOC Charge Against County of Suffolk, Police Department
     No. 520201002302

Dear Ms. Cosgrove:

     Because you filed the above charge with the Equal Employment
Opportunity Commission, and the Commission has determined that it will not
be able to investigate and conciliate that charge within 180 days of the
date the Commission assumed jurisdiction over the charge and the
Department has determined that it will not file any lawsuit(s) based
thereon within that time, and because you through your attorney have
specifically requested this Notice, you are hereby notified that you have
the right to institute a civil action under Title VII of the Civil Rights
Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named
respondent.

     If you choose to commence a civil action, such suit must be filed in
the appropriate Court within 90 days of your receipt of this Notice.

     The investigative file pertaining to your case is located in the EEOC
New York District Office, New York, NY.

     This Notice should not be taken to mean that the Department of
Justice has made a judgment as to whether or not your case is meritorious.

                              Sincerely,

                         Thomas E. Perez
                    Assistant Attorney General
                      Civil Rights Division

               by    *Karen J. Ferguson*

                    Karen L. Ferguson
                 Supervisory Civil Rights Analyst
                 Employment Litigation Section

cc: New York District Office, EEOC
    County of Suffolk, Police Department